Richard G. BAILEY, Norman R. Eggimann, Laurel Macy, Appellants,

v.

UNITED STATES of America, Appellee.

No. 16526.

United States Court of Appeals Ninth Circuit.

Aug. 24, 1960.

Rehearing Denied as to Appellant Barley Nov. 21, 1960.

See also 270 F.2d 86.

Howard R. Lonergan, Portland, Or., for appellants.

C. E. Luckey, U. S. Atty., Robert C. Snashall, Asst. U. S. Atty., Portland, Or., for appellee.

Before STEPHENS, HAMLEY and MERRILL, Circuit Judges.

MERRILL, Circuit Judge.

Appellants, following indictment and jury trial, were found guilty, on 26 counts, of the crime of mail fraud. 18 U.S.C. § 1341. They have consolidated their appeals from judgment of conviction and have assigned error in nine respects.

Appellants were among eight persons originally indicted in connection with the fraudulent scheme here involved. Three of those persons pleaded guilty. Two others were acquitted by court order during the course of trial. These three appellants remain. Appellant Bailey received a four-year sentence. Appellants Eggimann and Macy received six-month sentences upon one count. Upon the other 25 counts sentence was suspended and they were placed on probation for a period of three years, such probation to commence upon completion of the term of imprisonment.

The government's evidence showed that Bailey Lumber Company was a corporation operating a wholesale lumber business at Eugene, Oregon, of which Appellant Bailey was president and owner of approximately one-half of the capital stock. Until about June, 1953, the company purchased lumber from various mills and suppliers in the Eugene area and shipped the same by railroad to purchasers in California and other parts of the country.

Early in 1953, Appellant Bailey became interested in a mill located at Willow Creek, California. The Willow Creek Corporation was formed with Bailey serving as president and owning approximately one-half of the capital stock. By June, 1953, Bailey Lumber Company was dealing almost exclusively with Willow

Creek as a supplier. A drop in the price of lumber and a decision to rebuild and rehabilitate the Willow Creek mill resulted in a substantial drain upon Bailey's financial resources.

To facilitate its operations, Bailey Lumber had in 1950 opened a lumber line of credit with The First National Bank in Eugene. The bank agreed to lend the company 80% of the face value of invoices on loads of lumber which the company had actually shipped to customers. At no time did the bank agree to lend on unshipped orders for lumber.

When this line of credit had originally been established, the company practice was to ship by railroad in carload lots. The bank, under this practice, received not only the original invoices but also copies of the railroad bills of lading as evidence of the fact of shipment. The company practice later changed to shipment by truck and the bank at first accepted only the invoice. In March, 1953, the bank instituted the requirement that after each loan the company furnish a memorandum bill of lading or trucker's receipt with reference to such shipment. In September, 1953, the bank instituted the requirement that the bill of lading must accompany the invoice and be in the hands of the bank at the time the loan was made.

Due to the circumstances already mentioned, the lumber company at this time was dependent upon bank credit for its continued operations. It had ample orders but insufficient funds for producing the lumber with which to fill those orders. The scheme which the government's evidence established was one whereby the bank loans, unknown to the bank, would be obtained in advance of shipment so that the funds thus secured could be used to produce the lumber for such shipment. Until the bank requirement of a memorandum bill of lading became effective, the scheme was carried out by presenting invoices on unfilled orders. When the bank demanded proof of actual shipment, some further deception became necessary. The government produced testimony to the effect that Bailey and two other co-conspirators hit upon the plan of presenting false bills of lading. This practice was inaugurated. By the latter part of 1953, it had developed into a volume operation.

The government's evidence disclosed that the procedure would normally commence with a request by Bailey at Willow Creek for funds to meet payrolls, construction costs or other needs at Willow Creek. The personnel at the Eugene office would then prepare the necessary fictitious invoices and false memorandum bills of lading for presentation at the bank with promissory notes for each invoice. The fictitious invoices were kept in a separate file in the Eugene office and a memorandum slip representing each false invoice was kept on a spindle on the desk of the invoice clerk in Eugene. The fictitious sales were not taken up in the purchase and sale record of the company until such time (if at all) as the lumber was actually shipped.

This scheme was soon extended to apply not only to advance loans on actual shipments, but to cover loans in absence of any shipment whatsoever. In this respect the company involved itself in a type of kiting operation with loan number two providing the funds with which to meet loan number one. The company would secure a loan on fictitious invoice and bill of lading. With this sum it would send a check to a customer requesting that customer to send its check to the bank to pay off an earlier loan on a specified invoice. The bank was thus kept unaware of the fact that the earlier loan had related to no sale or shipment whatsoever.

In December, 1953, a new lumber line of credit was established at the Douglas County State Bank at Roseburg, Oregon. Within three weeks 86 invoices were presented to this bank, upon which approximately $60,000.00 was borrowed. No lumber was ever shipped on any of these invoices.

On January 10, 1954, a similar line of credit was established with the Bank of

California in Portland. Within a week $55,000.00 was borrowed. Approximately $50,000.00 covered invoices upon which no lumber was shipped.

On January 15, 1954, the banks learned of the fraud. Outstanding loans based upon fictitious instruments then aggregated approximately $250,000.00.

In the District Court the defense of each appellant in substance was that he had not participated in the fraudulent scheme. Upon this appeal, as the first assignment of error, each contends that the record is devoid of substantial evidence of participation.

As to Bailey the evidence of participation is overwhelming. Many witnesses testified that he was the actual operator of the lumber company and fully cognizant of the procedures being followed.

Appellant Eggimann had worked for the lumber company as bookkeeper and accountant until January, 1953. Thereafter, as public accountant, he had continued to handle company books in various respects. He admitted having knowledge of the fictitious invoice practice as early as July, 1953. As to his participation there is evidence that he set up the clearing account in the ledger to handle the exchange of checks with customers by which matured invoices were picked up. On behalf of the company and with knowledge of the fraudulent scheme, he continued to sign promissory notes to the bank to accompany invoices. He continued to sign checks in blank on behalf of the company, some of which were used in the exchange-of-check practice. While his involvement does not appear to be of a very high level, there is ample evidence of participation.

Appellant Macy was the bookkeeper at the company office in Eugene. On many occasions she received telephone calls from Bailey at Willow Creek requesting funds. She would then confer with Bailey's brother (one of the defendants who pleaded guilty) as to the number of false invoices necessary to raise the fund. She participated in the preparation of the false invoices and bills of lading and other papers presented to the bank. She made the entries in the sales record, entering only those of shipments actually made. She prepared the checks used in the exchange-of-checks maneuver and the day-to-day records covering these transactions. As with Eggiman, hers was a minor sort of involvement but the evidence of knowledgeable participation is ample.

Appellants assert failure of proof of the fact that lumber covered by invoice and bill of lading was not shipped. They state that the proof was confined to the fact of non-delivery which, it was shown, could have resulted from any one of a number of innocent causes. This contention we must reject. In view of the extensive testimony concerning the presentation of invoices and bills of lading representing lumber not shipped and the total number of non-receipts, the fact that some non-receipts were explainable does not suffice to take the question of non-shipment from the jury.

We conclude that the verdict, as to each appellant, is supported by substantial evidence.

Upon their second assignment of error, appellants contend that the case against them exceeded the scope of the indictment under which they were charged in that the indictment charges fraud by written instrument while the proof was directed to fraud by oral representation.

The indictments charged that "as a part of said scheme and artifice" defendants prepared (1) false invoices "purporting" to represent accounts receivable to the company and lumber shipments from the Willow Creek company to the consignees and (2) false memoranda of bills of lading "purporting" to be signed by representatives of carriers and to evidence actual shipments of lumber.

Appellants contend that the word "purport" has a technical meaning and is limited to that which is apparent on the face of the instrument; that neither invoices nor bills of lading upon their face

could be read as representations that lumber had been shipped to any consignee other than the company itself. Only through testimony as to conversations and oral agreements or understandings with the banks, they assert, could any representation be found that the documents in question covered actual shipments to purchasing consignees. Appellants thus contend, in effect, that the proof went to a crime other than the one with which they have been charged.

We regard this contention as without merit. The indictment charged the defendants with a "scheme and artifice to defraud certain banks in the State of Oregon * * * by means of false and fraudulent *pretences, representations* and documents, said defendants then and there well knowing that the said *pretences, representations* and documents were false when made." (Emphasis supplied.) The banks insisted upon evidence of lumber shipments as a condition to credit. The invoices and bills of lading were submitted to them as such evidence with the intent that the banks accept them as such. They were accepted as such. That the instruments upon their face may have fallen short of establishing actual shipments to the named consignees does not destroy their "purport" under the circumstances in which they were delivered to the banks. Technical deficiences in the instruments upon which the banks relied do not in any material respect vary the nature of the fraudulent scheme charged and proved to have existed. In the light of the broad scheme charged in the indictment, we have little doubt that appellants had notice of that which was proved and did not themselves so limit the meaning of the word "purport." See Kotteakos v. United States, 1945, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557; Berger v. United States, 1935, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314.

We conclude that proof did not depart from the charge of the indictment.

■ The third assignment of error relates to Bailey. He contends that the court improperly admitted evidence of an admission made by Appellant Macy which implicated Bailey without instructing the jury that such admission might not be used against him.

With reference to this admission, counsel for the government on two occasions in the presence of the jury advised the court that the statement was offered solely as an admission against Macy. The court advised the jury that it was only admissible as against Macy. In its instructions the court dealt with the extent to which a co-conspirator's admissions may be used against fellow conspirators. No different instructions were requested by Bailey. Accordingly, we conclude that this assignment is without merit.

■ The fourth assignment also relates to Bailey. He contends that the court improperly rejected evidence bearing upon lack of motive. He offered testimony that one Gleason, a man of wealth, was willing to advance money to Bailey "on the strength of his projects." Bailey contends that this would have demonstrated that he had no motive for engaging in the fraudulent scheme. The evidence was rejected by the court.

The offer of proof was not clear as to whether Gleason was willing to advance money without security. Unless he was, we fail to see the materiality of this evidence. Assuming that he was and that the evidence was material as bearing on motive, any error in excluding it must be regarded as harmless. In the light of the extensive evidence of Bailey's actual knowledge and participation, the question of why he should have felt impelled to engage in such a scheme becomes relatively inconsequential.[1]

---

1. Upon this (and other assignments of error subsequently discussed) Kotteakos v. United States, supra, is enlightening. At page 764, of 328 U.S., at page 1248 of 66 S.Ct., the Supreme Court states: "If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight

■ The fifth assignment of error relates to the refusal of the court to admit in evidence, under exception to the hearsay rule, declarations made by two persons during the course of Bailey Lumber Company's bankruptcy proceedings.

For such evidence to be admissible it must appear that the prior proceeding involved substantially identical issues and parties and that cross-examination was available to the adverse party in the instant case. 5 Wigmore, Evidence, 1386 (3rd Ed., 1940). Such showing has not been made. The issues with which the referee in bankruptcy was concerned were far different from those facing the District Court in this criminal action. The United States was only a claimant in the bankruptcy proceeding and there is no showing of occasion to cross-examine the persons in question. The referee cannot be considered a government representative.

Appellants assert that the testimony in question was admissible as declarations against interest. There is no showing that the offered testimony was against the interests of the witnesses save in one possible respect. Appellant Macy, as a witness, testified as follows: "Q. You employees then in Bailey Lumber Company unbeknownst to Dick Bailey volunteered your services in forging these bills of lading and creating these invoices? A. As far as I know it was without his knowledge."

■ Conceding, arguendo, that the implied admission of a civil liability was sufficient to render Macy's answer a declaration against interest and admissible, we regard the error as harmless. The fact that one of the many persons involved could not of her own knowledge connect Bailey with the scheme is of little import in the light of testimony of nine other witnesses relative to his knowledge and participation.

■ The sixth assignment of error relates to the extent to which a deposition was admitted in evidence. Appellants offered the deposition for purposes of impeachment. It was admitted in its entirety and thereafter, as an exhibit, given in its entirety to the jury. Appellants contend that it was only offered to the extent of specific contradictory statements and that to place the entire deposition in evidence and in the hands of the jury was prejudicial.

Under the circumstances in which the deposition was offered in evidence and later given to the jury as an exhibit, we are satisfied that appellants did not make their position clear to the District Court. Moreover, the allegedly prejudicial parts of the deposition are in a minor fashion merely cumulative of other testimony. We find no prejudice in the fact that they were made available to the jury.

■ The seventh assignment of error is advanced by Bailey alone. Appellants Eggimann and Macy elected not to take the witness stand. Their testimony was therefore not available to Bailey. He asserts error in the refusal of the District Court to instruct the jury that Bailey could not call these defendants as witnesses in his behalf.

While such an instruction might have benefited Bailey, it might also have been regarded as prejudicial comment, adverse to his co-defendants, upon their failure to testify.

We are not here concerned with "the right of an accused to insist on a privilege which Congress has given him." Bruno v. United States, 1939, 308 U.S. 287, 294, 60 S.Ct. 198, 84 L.Ed. 257. Rather, our concern is with the weighing of the possible benefit to be gained by Bailey from the requested instruction against the possible detriment to Eggimann and Macy. The District Court did instruct the jury that the law does not compel a defendant to take the witness stand and testify and that no presumption of guilt may be raised and no inference of any kind may be drawn from the failure of a defendant to testify. This

effect, the verdict and the judgment should stand, except perhaps where the

departure is from a constitutional norm or a specific command of Congress."

instruction in general terms reached the same result sought by Bailey and it could perhaps have been made to apply even more clearly without constituting comment in itself. We find neither error nor abuse of discretion in rejecting the requested instruction under the circumstances.

The eighth assignment relates to the state of the reporter's transcript. It appears that while the transcript is complete as to the trial proceedings, certain matters of legal argument and colloquy were omitted by the reporter. This point was presented to this court last year upon a motion by appellants and resulted in an order, August 8, 1959, directing the District Court to ascertain, upon hearing, the extent to which the transcript was incomplete. Hearings were had and the District Court has determined that nothing had been omitted which related to the points upon which the appellants intended to rely upon appeal. There is nothing in the record which suggests that this determination was erroneous or that appellants have suffered prejudice by any omission.

Finally, appellants assert abuse of discretion in that the trial was set and conducted with undue haste. Appellants' trial counsel came into the case shortly before trial. A continuance was refused. During the course of the trial, counsel on occasion requested and was refused recess for the purpose of discussing with newly arrived witnesses the testimony they were about to give. Other instances are mentioned of what appellants regard as undue haste or impatience on the part of the court.

We find no abuse of discretion in the court's refusal to tolerate what it regarded as unnecessary delay. At the time of substitution of counsel, when appellants' trial counsel first entered the case, the court made it clear that no substitution would be permitted if it would result in any delay or continuance. The court was assured that there would be no such result.

Affirmed.