## RIDENOUR et al. v. UNITED STATES.

(Circuit Court of Appeals, Third Circuit. September 7, 1926.)

Nos. 3400–3403.

**1. Criminal law ⚖➡1167(1).**

In prosecution under Criminal Code, § 215 (Comp. St. § 10385), for use of mails to defraud, by manipulations of corporate stock, inaccuracy of allegation in indictment that certain transactions were between certain companies *held* not prejudicial.

**2. Post office ⚖➡49.**

In prosecution under Criminal Code, § 215 (Comp. St. § 10385), for use of mails to defraud, by manipulations of corporate stock and sales through particular agency, evidence of acts and declarations of salesmen of such agency *held* admissible.

**3. Post office ⚖➡49.**

In prosecution under Criminal Code, § 215 (Comp. St. § 10385), for use of mails to defraud, by manipulations of corporate stock and sales through particular agency, testimony tending to show that such agency had not been defrauded *held* immaterial and irrelevant.

**4. Post office ⚖➡49.**

In prosecution under Criminal Code, § 215 (Comp. St. § 10385), for use of mails to defraud, by sales of corporate stock through particular agency, refusal to admit evidence as to who gave information on which salesmen of such agency were arrested *held* not error.

**5. Witnesses ⚖➡330(3).**

In prosecution under Criminal Code, § 215 (Comp. St. § 10385), for use of mails to defraud, by manipulations in sales of corporate stock, refusal to permit particular witness to be asked as to his connection with independent matter, to affect his credibility, *held* not error.

**6. Criminal law ⚖➡691.**

Refusal to strike out answer to particular question, on ground that it was not responsive to question, *held* not error; examiner alone having right to object to answer on that ground.

**7. Post office ⚖➡49.**

In prosecution under Criminal Code, § 215 (Comp. St. § 10385), for use of mails to de-

fraud, by manipulations and sales of corporate stock, admission of testimony of receiver that he failed to collect debenture bonds of company involved held not error.

**8. Criminal law ⚖︎⟾829(8).**

In prosecution under Criminal Code, § 215 (Comp. St. § 10385), for use of mails to defraud, by manipulations and sales of corporate stock, requested instruction affecting evidence of good character, as raising reasonable doubt, held sufficiently covered by instructions given.

**9. Criminal law ⚖︎⟾833.**

Instructions need not be given in forms and language in which they are asked.

**10. Conspiracy ⚖︎⟾47—Post office ⚖︎⟾49.**

Evidence held insufficient to sustain conviction of particular defendant for conspiracy and for use of mails to defraud, by manipulations and sales of corporate stock, in violation of Criminal Code, §§ 37, 215 (Comp. St. §§ 10201, 10385.)

**11. Criminal law ⚖︎⟾753(2).**

Trial court should direct verdict for defendant, unless there is substantial evidence of facts which exclude every hypothesis but that of guilt.

In Error to the District Court of the United States for the Western District of Pennsylvania; Frederic P. Schoonmaker, Judge.

L. N. Ridenour and others were convicted of using the mails to defraud, and of conspiracy, and they bring error. Reversed as to defendant H. G. Olney; otherwise, affirmed.

Luther Day, of Cleveland, Ohio, for plaintiff in error Olney.

Homer H. McKeehan, of Cleveland, Ohio, for plaintiff in error Seaver.

Richard W. Martin and Homer N. Young, both of Pittsburgh, Pa., for other plaintiffs in error.

John D. Meyer, U. S. Atty., and F. C. McCutcheon, Asst. U. S. Atty., both of Pittsburgh, Pa.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge. The above-named defendants were indicted and tried with Walter Temme and F. L. Kendig for having used the United States mails to carry out a scheme and artifice to defraud, which they had devised, and for conspiracy in violation of sections 37 and 215 of the federal Criminal Code (Comp. St. §§ 10201, 10385). The indictment contains 13 counts. The first 12 are for the misuse of the mails, and the last is for conspiracy to carry out the scheme and artifice set out in the other counts.

At the trial, the judge directed the jury to return a verdict of "not guilty" as to Walter Temme, and the jury acquitted F. L. Kendig. The other six were found guilty, and the judgment is here on their writ of error.

The story of the various activities of the defendants is long, involved, and confused; but, in order to appreciate the ruling by the trial judge on technical objections, it is necessary to give a short account of their principal transactions. Ridenour and Seaver, with others, organized a corporation in 1920, known as the Continental Grocery Stores, Incorporated, for the purpose of establishing a chain of stores in Ohio. When they attempted to sell the stock of the company, the department of securities of the state of Ohio required them to organize a fiscal company, for the purpose of selling the stock of the Continental Grocery Stores, Incorporated, which was capitalized at $1,000,000 8 per cent. preferred stock and $1,000,000 common stock. They organized the fiscal company, which was known as the Continental Grocery Stores Company.

They opened the first store in Cleveland, Ohio, on January 15, 1921; but prior to this time Ridenour and Seaver had decided to extend their system. They associated with themselves for this enterprise Dunlap, Whitney, Cowell, and Olney, and early in January, 1921, organized a corporation in the commonwealth of Pennsylvania, known as the Continental Grocery Stores of Pennsylvania, Incorporated. Ridenour was president, Whitney vice president, Seaver secretary, Cowell assistant secretary, Dunlap treasurer, and Olney assistant to the president. The Pennsylvania corporation was capitalized at $2,000,000 preferred stock to be sold to the public, and $2,000,000 common stock, issued to the incorporators as promotion stock, but subsequently returned to the corporation, to be given in part as bonus on the sale of preferred stock of the Pennsylvania Company, one share of common for every two shares of preferred stock purchased.

At about the same time this operating company was organized in Pennsylvania, they organized a Pennsylvania fiscal company, called the Continental Grocery Company, Incorporated, to sell the stock of the Pennsylvania operating company, which immediately entered into a contract with the selling company, whereby the latter was to sell the stock of the former on a commission of 15 per cent. On October 1, 1921, the de-

fendants organized another corporation, called the Continental Corporation, whose object was to assume the functions of both the Ohio and the Pennsylvania fiscal companies.

The fiscal company of Pennsylvania entered into an agreement with the new fiscal company, the Continental Corporation, to sell the stock of the Pennsylvania operating company on a commission of 25 per cent. This agreement was to date back to the date of the agreement between the Pennsylvania fiscal and operating companies. The Continental Corporation was to have the assets and assume the liabilities of the Pennsylvania fiscal company. The liabilities exceeded the assets by about $37,000. The stock of the Pennsylvania operating company was sold mostly on the installment plan, but the certificates of stock were not delivered by the Continental Corporation until the stock was fully paid for. In the meantime the money received from the installment payments was kept by the Continental Corporation. The defendants, as officers of the Pennsylvania operating company, delivered $1,000,000 worth of the common stock of that company to themselves as officers of the Continental Corporation, and as such officers delivered to themselves as officers of the Pennsylvania Company $1,000,000 of the common stock of the Continental Corporation, which paid to them several dividends.

In addition to the five companies which are mentioned above, the defendants, or some of them, organized two other companies. The result was a confusion of seven "Continental" companies: The Continental Grocery Stores, Incorporated, Continental Grocery Stores Company, Continental Grocery Stores of Pennsylvania, Incorporated, Continental Grocery Company, Incorporated, the Continental Corporation, the Continental Properties Company, and the Continental Chain Stores, Incorporated.

While these corporations were being organized, and while their stock was being manipulated, the operating companies of Ohio and Pennsylvania were establishing stores here and there, mostly in Cleveland and Pittsburgh. For a while, particularly in Cleveland, the operation of the stores and the sale of stock seem to have gone along successfully. The defendants received from the sale of stock of the Ohio operating company about $700,000, from that of the Pennsylvania operating company about $800,000, from that of the Continental Properties Company between $30,000 and $40,-000, and from the Continental Corporation about $40,000. The gross receipts of the Continental Grocery Stores of Pennsylvania from January, 1921, to March, 1923, amounted to more than $2,000,000. But as time went on stores were established faster than sound business judgment dictated, and consequently they became financially embarrassed. This alone, or together with other causes, led to the organization of corporations, to questionable methods of stock manipulation, and then to direct misrepresentation. Finally the whole enterprise looked like an illegitimate business, a scheme to defraud, in which the United States mails were used in violation of section 215 of the Federal Criminal Code.

Whatever might have been the motives of the defendants in the beginning in establishing a chain of stores, in organizing the various corporations, and in selling stock, in the end there can be little doubt that their sole object was "to get the money," even though their methods were "disgustingly dishonest." On May 9, 1922, the operating company of Pennsylvania entered into a contract with the Crager System, Inc., whereby the latter was to sell the stock of the former. On its face, this contract purported to be a sale of a certain amount of common stock; but in reality the salesmen of the Crager System simply became the agents of the defendants for the sale of the stock of the Pennsylvania operating company. The Crager salesmen do not appear to have been overly scrupulous.

Ridenour, president of the Continental Corporation, in writing to Olney, Nims, and Seaver, said that they were all aware that the sales by the men of the Crager Company would be accompanied by a "certain amount of dirty work and subsequent grief," and urged that they, as "principal executives in the fiscal end of the work, must guard against the demoralization from your observation of things that are disgustingly dishonest. You must steel yourselves to look upon this as the price we are paying for an amount of money which is going to be of wonderful benefit to our stockholders."

There are 52 assignments of error, but all of these have been compressed into a few propositions:

[1] The first one is that the plaintiffs were tried upon charges not contained in the indictment. By this they refer to the allegation in the indictment that certain transactions took place between two of the companies, which were named, when, in fact,

they were between one of the corporations which was named and another one which was not named. The defendants, with the possible exception of Olney, organized, as above stated, seven "continental" corporations. It was practically impossible to keep the names and corporate entities separate and distinct. The defendants did not do so. Money was kept by one which belonged to another. The real, living entities were the defendants, who used these seven "continental" creatures as tools with which to work out their schemes and artifices. The officers in all of them were practically the same.

Whether or not a certain stated transaction was with one or another of these corporations, whose stock was being manipulated and whose accounts were changed from corporation to corporation, is, under the facts of this particular case, immaterial. In executing these schemes and artifices, the defendants sometimes used this tool and sometimes that one. It did not make much difference which corporation they used, for their seven names were so nearly alike and their number so great as to serve no purpose, except to confuse. The defendants were not prejudiced by the mention in one case of the name of one corporation, when another was intended. There was no plea of surprise; nor was there any intimation that the defense would have been different, had the corporation intended been mentioned. Consequently there was no prejudice, and no injury done.

[2] The proofs show that the Crager System, through its salesmen, represented to the purchasers that they were the agents of the Continental Grocery Stores of Pennsylvania, Incorporated, and they further show that the Crager System employees were at all times subject to the defendants. It therefore makes no difference whether this was a contract of sale or of agency. The defendants brought into their schemes the Crager salesmen, directed them, assumed the responsibility, and reaped the reward from their sales. It was therefore not error to admit in evidence the acts and declarations of these salesmen in executing the schemes the defendants had devised.

[3] The defendants further complain that the court refused to permit the officers of the Crager System, under cross-examination, to answer how much it owed the Continental Grocery Stores Company at the time the business was wound up by the government, in order to show that the Crager System was not defrauded. This was immaterial and irrelevant, under the pleadings and the case as tried.

[4] It was likewise immaterial who made the complaint in this case. The refusal of the court to allow Crager to state who gave the information on which his men were arrested was not error.

[5] Nor was it error for the court to refuse to allow a witness to be asked his connection with Gaston B. Means and Thomas Felder, in their activity in the National Casket Company. The only possible purpose of this testimony was to affect the credibility of the witness; but that must be done on material, and not immaterial, issues. Whether or not the witness entered into an arrangement to pay Means and Felder, or either of them, $65,000 in the National Casket Company Case, was a collateral issue, which might have led to endless confusion, and it was not error to sustain an objection to that question. Greenleaf on Evidence (14th Ed.) § 461e.

[6] Armour testified on the part of the government that H. G. Olney told him that "I have been swindled." Defendants asked that this testimony be "stricken out, as not responsive to the question." This refusal was not erroneous, for the examiner alone had the right to object to the answer, or ask to have it stricken out on that ground. In re Dunahugh, 130 Iowa, 692, 107 N. W. 925; Hamilton v. People, 29 Mich. 173; Jones v. New York Central & H. R. R. Co., 46 App. Div. 470, 61 N. Y. S. 721.

[7] Objection was made to the testimony that the receiver of "the Continental Grocery Stores, Inc., the Ohio company," sold the assets for $35,000, and that he failed to collect the debenture bonds of that company, on the ground that this testimony would not support a finding that the bonds were worthless, when they were sold by the Ohio company to the Pennsylvania company. This testimony, standing alone, might not establish that fact; but, in connection with other testimony, it might establish that they were worthless, and so it was an element to be considered by the jury, and was properly admitted. Anyhow, there is little doubt that they were worthless.

[8] Exception was taken to the following statement in the charge to the jury:

"Of course, you can never prove a man's intent by words; you can only judge that fact from his act and his conduct; and from the testimony in this case you will have to say whether these men innocently

went into this enterprise, or whether they went in with intent to defraud or deceive."

Exception was also taken to the refusal to charge the following request:

"Each defendant has placed before you evidence of his good reputation. If you believe from that evidence that the defendants, or any of them, had a good reputation, such fact is an important factor to be considered by you in determining the guilt or innocence of him in whose behalf it is established. When considered by you in connection with the other evidence in the case, it may create a reasonable doubt as to the guilt of such person. Therefore, if such evidence of good reputation, when considered by you with the other evidence in the case, creates in your mind a reasonable doubt as to the guilt of the defendant having a good reputation, then it is your duty to find such defendant not guilty, and to return your verdict in his favor."

The judge said: "Covered by general charge." His general charge on this subject was:

"We might say right here, in connection with the testimony as to the reputation of Mr. Cowell, as well as the testimony with reference to the good reputation of the other defendants—all of whom have offered some testimony as to their good reputation in the communities in which they live—that testimony, gentlemen, is testimony, positive testimony in the case, which is properly to be considered by you. Testimony of good character alone, however, is not sufficient to raise a reasonable doubt in your mind; but, considered in connection with the other testimony in the case, it might be. In general, it might be said that consideration of the testimony of good character might reasonably and properly be in this light: Is it likely that a man who bears the reputation that this man does in the community in which he lives would be engaged in this enterprise to deceive and defraud? That is the general way that that testimony should be considered in connection with the other testimony in the case. It is positive testimony, and is for your consideration."

The charge on good reputation did not then and there contain the statement, as did the request that if, after considering the reputation of the defendants for good character, the jury had a reasonable doubt as to their guilt, they should acquit them, but the judge had just before charged on reasonable doubt as follows:

"Now, gentlemen, as you approach this case, as in every criminal case, you approach it with the knowledge that under the law every man comes into court presumed to be innocent, and that presumption of innocence rests with him until you, gentlemen of the jury, become satisfied by the proofs beyond a reasonable doubt that the defendant is guilty of the offense with which he is charged; and that applies to each and every of the defendants who come into court in this case. That presumption of innocence comes with him when he comes into court, and remains with him until you, gentlemen of the jury, become satisfied by proofs beyond a reasonable doubt that he is guilty of the offense charged against him. And we may say, gentlemen of the jury, that the burden rests upon the government to satisfy you by proof beyond a reasonable doubt that the defendants are so guilty."

[9] This part of the charge was really an instruction to the jury that, so long as it had a reasonable doubt, created by the consideration of their reputation for good character in connection with the other evidence in the case, or otherwise created, they should not render a verdict of guilty. These two parts of the charge correctly instructed the jury as to the law and substantially covered the request. It has often been determined that a court is not required to instruct the jury in the forms and language in which they are asked. Kaufmann et al. v. United States (C. C. A.) 282 F. 776, 784; Cohen v. United States (C. C. A.) 282 F. 871; Ohio & Mississippi Railway Co. v. McCarthy, 96 U. S. 258, 265, 24 L. Ed. 693.

[10] We have carefully considered every assignment of error, but do not find that the learned trial judge committed error, except as to H. G. Olney, who was simply an employee of the defendants. He had no control over the finances or the books, did not and was not in a position to determine the policy of the defendants in their operations, but he did call to the attention of Mr. Ridenour, who in many ways seems to have been the master mind in devising and executing these schemes, the questionable methods of the salesmen of the Crager System. The evidence is not sufficient to sustain a conviction as to him.

[11] "Unless there is substantial evidence of facts which exclude every other hypothesis but that of guilt, it is the duty of the trial court to instruct the jury to return a verdict for the accused; and where all the substantial evidence is as consistent with innocence as with guilt, it is the duty of the appellate court to reverse a judgment of conviction." Hart v. United States, 84 F.

799, 808, 28 C. C. A. 612, 621; Union Pacific Coal Co. v. United States, 173 F. 737, 740, 97 C. C. A. 578; Wright v. United States, 227 F. 855, 857, 142 C. C. A. 379; Joseph Wiener et al. v. United States (C. C. A.) 282 F. 799, 801; Yusem v. United States (C. C. A.) 8 F.(2d) 6. We feel that this rule of law required the court to direct a verdict of acquittal as to Olney as requested.

The judgment as to Olney is reversed, and a venire facias de novo awarded; but the judgment as to Ridenour, Seaver, Dunlap, Whitney, and Cowell is affirmed.