**L. M. SMITH,** also known as Laurence M. Smith, and Earl C. Corey, Appellants,

v.

**UNITED STATES** of America, Appellee.

Nos. 17601, 17278.

United States Court of Appeals Ninth Circuit.

June 27, 1962.

Rehearing Denied July 31, 1962.

See also 294 F.2d 771.

Bernard, Bernard, Edwards & Hurley, E. F. Bernard, Portland, Or., for appellant Corey.

Mautz, Souther, Spaulding, Kinsey & Williamson, Bruce Spaulding, and A. Allan Franzke, Portland, Or., for appellant Smith.

Sidney I. Lezak, Acting U. S. Atty., and David Robinson, Jr., Asst. U. S. Atty., Portland, Or., for appellee.

Before CHAMBERS, BARNES and HAMLEY, Circuit Judges.

HAMLEY, Circuit Judge.

L. M. Smith and Earl C. Corey were jointly tried and convicted on charges involving 15 U.S.C.A. § 714m(a) and 18 U.S.C. §§ 371 and 434.[1] While their appeals from these convictions, consolidated as No. 17278, were pending here, they separately moved in the district court for a new trial on the ground of newly-discovered evidence. The motions being denied, they have appealed from the order of denial, these appeals being consolidated as No. 17601. Both appeals will be disposed of in this opinion.

In the spring of 1956, Corey was the director of the Portland Commodity Office, Commodity Stabilization Service, United States Department of Agriculture (Commodity). That office was charged with administering the farm price control activities of the Commodity Credit Corporation, including the storage of Government-owned wheat. At that time Corey became aware of the availability of a warehouse located near Portland, Oregon, which was suitable for storage of grain. He discussed with one Willard A. Richards the possibility of making use of this warehouse for the storage of Government grain. Richards was then general manager of North Pacific Grain Growers, a large private grain cooperative.

Following these discussions, Corey and Richards met with Smith, who was experienced in the warehousing of grain. Corey and Richards indicated to Smith at that time that they were interested in operating the warehouse on a partnership basis, provided Smith would handle the actual operation with Corey and Richards as "silent" partners. Smith examined the warehouse, decided that it was suitable for the purpose, and determined that it would require about $90,000 to get the enterprise in operation.

The three men then entered into an oral agreement to engage in the enterprise. Under this agreement, Smith was to lease and operate the warehouses and supply the necessary finances. Corey and Richards were later each to supply one-third of the estimated cost, and were to share equally with Smith in the liabilities and profits of the business. Smith negotiated for and, on April 10, 1956, with his wife, entered into a lease for the warehouse. Later an additional lease

---

1. 15 U.S.C.A. § 714m(a)

"Whoever makes any statement knowing it to be false, or whoever willfully overvalues any security, for the purpose of influencing in any way the action of the Corporation, or for the purpose of obtaining for himself or another, money, property, or anything of value, under sections 714–714o of this title, or under any other Act applicable to the Corporation, shall, upon conviction thereof, be punished by a fine of not more than $10,000 or by imprisonment by [sic] not more than five years, or both."

18 U.S.C. § 371

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

* * * * *

18 U.S.C. § 434

"Whoever, being an officer, agent or member of, or directly or indirectly interested in the pecuniary profits or contracts of any corporation, joint-stock company, or association, or of any firm or partnership, or other business entity, is employed or acts as an officer or agent of the United States for the transaction of business with such business entity, shall be fined not more than $2,000 or imprisoned not more than two years, or both. June 25, 1948, c. 645, 62 Stat. 703."

covering another warehouse was entered into by Smith and his wife. Smith, on his own account, borrowed all of the money necessary to equip the warehouses and start the business. The business was named "Three-State Warehouse Company".

Smith applied for, and on April 26, 1956, received a grain storage agreement with Commodity for such Government wheat as that corporation might thereafter see fit to entrust to him.

In July, 1956, Richards paid Smith $30,000 as his share of the estimated cost of establishing the business. Thereafter Corey delivered to Smith his promissory note for $30,000, representing his share of the original capital. This note was later paid by deductions from proceeds payable to Corey out of the earnings of the business. In August, 1956, the three men entered into a written partnership agreement.

The warehouses were owned by the partnership until April 30, 1959, at which time the business was incorporated. Smith, his wife, and the corporation attorney were named the directors and officers, the partners receiving equal stock ownership and the management continuing with Smith.

The business was operated at a loss during the first year, and thereafter a profit was realized each year. The profits were divided equally between Smith, Corey and Richards. The business of Three-State Warehouse Company consisted solely of the storage of grain for Commodity.

Shortly after the incorporation of the business Corey terminated all of his interest in the corporation by selling his stock therein to the corporation for $30,000. He later explained this action as having been motivated by a desire not to embarrass the Secretary of Agriculture, although at that time his interest had not been discovered.

The indictment consists of eleven counts, Counts I through VIII, inclusive, consist of charges that Smith, for the purpose of influencing the action of Commodity, and to obtain money and other things of value under the Commodity Credit Corporation Act, and in violation of 15 U.S.C.A. § 714m(a), knowingly, on various dates from April 25, 1956 to April 30, 1958, caused to be made false statements to the effect that Smith was the sole owner of Three-State Warehouse Company, whereas in truth that company was a partnership owned by Smith, Corey and Richards. These false statements, it was charged, were made in various written documents consisting of applications for approval of warehouse facilities, grain storage agreements, and statements of assets and liabilities.

In Count IX of the indictment it was charged that between April 6, 1956 and May 1, 1959, Smith and Corey conspired with each other and with Richards in violation of 18 U.S.C. § 371, to violate 15 U.S.C.A. § 714m(a) by making to Commodity the false statements referred to in Counts I to VIII, for the purposes charged in those counts. Various overt acts pursuant to this asserted conspiracy, consisting of meetings, discussions, and the execution and filing of documents, were alleged.

In Count X it was charged that between April 26, 1956 and May 1, 1959, Corey, being a partner, member officer, and agent of Three-State Warehouse Company, and directly and indirectly interested in the profits and contracts of that partnership, was employed and acted as an officer and agent of the United States for the transaction of business with that company, in violation of 18 U.S.C. § 434.

In the final Count, XI, it was charged that, commencing on March 1, 1956, and continuing to May 1, 1959, Corey and Smith conspired together and with Richards, to commit an offense against the United States and to defraud the United States in violation of 18 U.S.C. § 371. The offense and fraud which was the subject matter of the conspiracy was the asserted violation of 15 U.S.C. § 434 by Corey, as charged in Count X. Several overt acts, it was alleged, were committed pursuant to this conspiracy.

Richards, who testified as a witness for the Government, was not indicted.

Each appellant was found guilty on all charges made against him, and each was sentenced to two years on each count of which he was convicted. The sentences were made concurrent so that each appellant was sentenced to a total of two years imprisonment.

We turn first to the appeals from the district court orders denying appellants' motions for a new trial on the ground of newly-discovered evidence.

After the trial appellants learned for the first time that Commodity became aware of Corey's interest in the warehouse company by examining his federal income tax returns. This information was disclosed to them by the Government in answers to interrogatories propounded in civil litigation involving Three-State Warehouse Company.

It is appellants' position that, in examining Corey's income tax returns, Department of Agriculture officials violated 26 U.S.C. § 7213(a), forbidding unauthorized disclosure of information set forth in income tax returns.[2] Based on the assumption that the inspection was illegal, appellants argue that all of the evidence so collected was inadmissible under the rationale of Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L. Ed.2d 1669.

By the terms of the exception stated in § 7213(a), information contained in income tax returns may be disclosed "as provided by law." In its answer to the interrogatories the Government stated that the inspection was made pursuant to 26 C.F.R. 458.33.[3] However this regulation was issued under the 1939 Code, and appellants assert that it has no application to a return filed pursuant to the 1954 Code.

Inspection of returns made pursuant to the 1954 Code is provided for in 26 U.S.C. § 6103(a).[4] In all material re-

---

2. 26 U.S.C. § 7213(a) provides, in relevant part:

"(a) Income returns.—

"(1) Federal employees and other persons.—It shall be unlawful for any officer or employee of the United States to divulge or to make known in any manner whatever not provided by law to any person the amount or source of income, profits, losses, expenditures, or any particular thereof, set forth or disclosed in any income return, or to permit any income return or copy thereof or any book containing any abstract or particulars thereof to be seen or examined by any person except as provided by law; * * *."

3. 26 C.F.R. § 458.33(a) reads as follows:

"*Inspection by branch of Government other than Treasury Department—(a) General.* Except as provided in § 458.34, if the head of an executive department (other than the Treasury Department), or of any other establishment of the United States Government, desires to inspect or to have some other officer or employee of his branch of the service inspect a return in connection with some matter officially before him, the inspection may, in the discretion of the Secretary of the Treasury, be permitted upon written application to him by the head of such executive department or other Government establishment. The application shall be signed by such head and shall show

in detail why the inspection is desired, the name and address of the taxpayer who made the return, and the name and official designation of the person it is desired shall inspect the return. The information obtained under this section and § 458.32 may be used as evidence in any proceeding, conducted by or before any department or establishment of the United States, or to which the United States is a party."

4. 26 U.S.C. § 6103(a). Publicity of returns and lists of taxpayers.

"(a) Public record and inspection.—

"(1) Returns made with respect to taxes imposed by chapters 1, 2, 3, and 6 upon which the tax has been determined by the Secretary or his delegate shall constitute public records; but except as hereinafter provided in this section, they shall be open to inspection only upon order of the President and under rules and regulations prescribed by the Secretary or his delegate and approved by the President.

"(2) All returns made with respect to the taxes imposed by chapters 1, 2, 3, 5, 6, 11, 12, and 32, subchapters B, C, and D of chapter 33, and subchapter B of chapter 37, shall constitute public records and shall be open to public examination and inspection to such extent as shall be authorized in rules and regulations promulgated by the President."

spects this section is identical to § 55(a) of the 1939 Code, 26 U.S.C. § 55(a). Rules and regulations implementing § 55(a) were provided by T.D. 4929, which became 26 C.F.R. 458.33. The authority for these regulations is found in the Executive Order of August 28, 1939 (1939–2 C.B. 97) quoted in the margin.[5]

The "carry-over" section of the 1954 Code, 26 U.S.C. § 7807(a)[6] provides that any section of the 1954 Code "which depends for its application upon the promulgation of regulations," is implemented by regulations prescribed under the 1939 Code which would be appropriate as regulations for the indicated section of the 1954 Code, until regulations are actually promulgated under the latter statute. No such regulations having been issued pursuant to § 6103(a), a section which depends for its application upon the promulgation of regulations, the regulations promulgated to implement its counterpart in the 1939 Code, § 55(a), were carried over, and therefore apply to a return filed pursuant to the 1954 Code.

Appellants also contend, however, that under the regulation in question (26 C.F.R. § 458.33), the only inspections which are in any event authorized are those made under § 6103(a) (1). It is conceded by the Government that the questioned inspections would not have been authorized under § 6103(a) (1), reliance being placed solely on § 6103(a) (2).

In support of this contention, which was first advanced in Corey's reply brief, our attention is called to the phraseology of T.D. 4929, quoted in note 5, under which 26 C.F.R. § 458.33 was issued. In this order the President authorized inspections in accordance with regulations "prescribed" by the Secretary and "approved" by the President. This language appears in § 6103(a) (1), whereas § 6103(a) (2) refers to inspections authorized in rules and regulations "promulgated" by the President.

Despite the fact that the word "promulgated" does not appear in T.D. 4929, we believe that this presidential order was intended to cover inspections made under § 55(a) (2) of the 1939 Code (the counterpart of § 6103(a) (2) of the 1954 Code), as well as § 55(a) (1). The order commences with the recital, "By virtue of the authority vested in me by section 55(a) * * *," which of course embraces both (1) and (2) of § 55(a).[7] Had the President intended to invoke

---

5. This order reads as follows:

"By virtue of the authority vested in me by section 55(a) of the Internal Revenue Code (53 Stat., 29), it is hereby ordered that the following designated returns made under the said Code shall be open to inspection in accordance and upon compliance with the rules and regulations prescribed by the Secretary of the Treasury in the Treasury decision relating to the inspection of such returns, approved by me this date.

"Income (including income of personal holding companies and unjust enrichment income), excess-profits, capital stock, estate, and gift tax returns, and returns of employment tax on employers under Subchapter C of Chapter 9 of the Internal Revenue Code."

"Franklin D. Roosevelt.
"The White House,
"August 28, 1939"

6. 26 U.S.C. § 7807(a) reads:

"Rules in effect upon enactment of this title
"(a) Interim provision for administration of title.—Until regulations are promulgated under any provision of this title which depends for its application upon the promulgation of regulations (or which is to be applied in such manner as may be prescribed by regulations) all instructions, rules or regulations which are in effect immediately prior to the enactment of this title shall, to the extent such instructions, rules, or regulations could be prescribed as regulations under authority of such provision, be applied as if promulgated as regulations under such provision."

7. The Executive Order, No. 10906 of January 17, 1961, 26 U.S.C.A. § 6103 note, which authorizes inspections pursuant to § 6103 of the 1954 Code, also makes no distinction between subsections (1) and (2) in the statement of authority contained in the order.

only § 55(a) (1), it is probable that this recital would have been so limited.

The antecedents of (1) date back to the Revenue Act of 1919, 40 Stat. 1086, while (2) was added by the Revenue Act of 1934, 48 Stat. 698. The legislative history of the latter Act discloses no reason why the same language was not employed in (2) as then existed in (1). Nor, apart from legislative history, has any reason been suggested, why Congress would want presidential permission for subsection (2) inspections to be manifested in a different way than in the case of subsection (1) inspections.

In the absence of any factual support for such a view we will not assume that Congress used the word "promulgate" in subsection (2) because it wished the President to personally draft regulations pertaining to that subsection. It is much more reasonable to assume that Congress expected that regulations giving effect to subsection (2) would be drafted by the proper administrative department and thereafter submitted to the President for acceptance or rejection.

This is exactly what occurred with respect to T.D. 4929 when the President approved regulations prescribed by the Secretary. The Secretary's prescription of regulations was not alone sufficient, the approval of the President was required. In effect, then, such approval constituted promulgation of the regulations, insofar as inspections of the kind here under discussion are concerned.

■ We conclude that under T.D. 4929, and C.F.R. § 458.33, inspections of the kind described in § 6103 (a) (2) were authorized.

Appellants do not contend that the procedure followed by the Department of Agriculture in obtaining copies of Corey's income tax returns is contrary to that specified in the rules and regulations in question. We therefore conclude that the district court did not err in denying the motions for a new trial.

This brings us to the specifications of error relating to the judgments of conviction.

Smith contends that the court erred in making the following comment to the jury in the course of its instructions:

"Perhaps this is a good place for me to comment on Mr. Phelps. I think most of you already know by my questions and by the statement I made at the conclusion of his testimony that I didn't think very much of Mr. Phelps either as a lawyer or as a man * * *.

"In other words, I am not commenting upon the credibility of any other witness other than Mr. Phelps, and I do that because I think it was apparent to you that I didn't believe him when he testified."

The making of this comment had its genesis in an exchange between the judge and Jon A. Phelps which occurred while Phelps was on the witness stand. Phelps, who is a lawyer, was called to corroborate Smith's testimony that he had obtained legal advice to the effect that Corey's participation in the business would not be illegal. During cross examination Phelps testified that it had been his opinion that Smith had been operating individually, before the written agreement between Smith, Corey and Richards was drawn, and that even after the signing of the agreement Smith was the owner and operator, with Corey and Richards as indemnifiers rather than partners.

The judge then questioned Phelps in detail as to whether such an opinion was justified in view of the specific provisions of the written agreement. The judge began with the question, "That is not the way you drew it, though, is it?" Calling attention to a particular section of the agreement, the judge then stated: "You provided that Smith couldn't even execute a bond without the permission of the other two men." Phelps called attention to another provision which he believed to support his view, whereupon the judge again referred to the section to which he had first directed attention. Phelps made a response which obviously did not satisfy the judge, whereupon this colloquy occurred:

"The Court: There is no provision for indemnification in that contract, is there? Young man, how long have you practiced law? The Witness: Eleven years. The Court: How long had you practiced at the time Mr. Smith came to see you? The Witness: Seven years, if the Court please. The Court: Had you practiced continuously? The Witness: Yes, sir * * *."

Almost immediately after this episode, which evoked no objection from Smith's counsel, the judge, apparently realizing that the correctness of Phelps' legal advice to Smith was irrelevant, told the jury on his own motion:

"THE COURT: Ladies and Gentlemen, this evidence is not to determine whether he got good advice or not. I might tell you it is just to determine whether Mr. Smith acted in good faith in reliance on the advice given to him by a lawyer. You do not have to determine whether Mr. Phelps is a good lawyer or not. You just have to determine

whether Mr. Smith acted on his advice."

It would have been better if the judge had not engaged in this colloquy with Phelps on a matter which shortly afterwards was recognized as being irrelevant. Any prejudice which might otherwise have resulted from this incident, however, was in our opinion overcome by the instruction, quoted above, which the judge gave almost immediately after the incident.

The comment concerning Phelps' credibility, made at the close of the case, was within proper bounds, when considered in context.[8] The fact that such comment may also have indirectly reflected upon Smith's credibility, in view of the corroborative nature of Phelps' testimony in other respects, is immaterial.

Smith next argues that the court erred throughout the trial in unnecessarily taking an active part in the prosecution, interfering with the examination of witnesses, questioning and commenting in such way as to show a hostile attitude

---

8. The comment complained of consists of two remarks. Shortly before the first of these, the court told the jury:

"If a person in good faith seeks the advice of a lawyer as to what he may lawfully do in the matter of forming and operating a partnership with two undisclosed partners, one of whom is then Director of the Government agency with which the partnership proposes to deal, and if he fully lays all of the facts which he honestly regards as pertinent before his lawyer and then honestly and in good faith follows the lawyer's advice, which he believes to be correct, he would not be guilty of any crime even if the advice proved to be wrong."

Immediately after the first remark complained of, the court stated:

" * * * Under the law I have the privilege of making this statement because I may comment upon the credibility of any and all witnesses. But you are privileged to disregard any comment I make about the credibility of a witness because, under the law, you are the sole and exclusive judges of the facts and the credibility of all witnesses. Therefore, if you decide that Mr. Phelps is a creditable witness and he is to be believed, you have the

privilege of doing that in spite of what I commented. I want to make it perfectly clear that the mere fact that I have singled out Mr. Phelps for special attention does not mean that I believe that all of the other witnesses were telling the truth or the whole truth. That will be a matter for you to determine under the rules that I shall lay down for you."

Later in the course of the instructions, the court told the jury: "You are the exclusive judges of the facts in the case, and the credibility of all the witnesses." This same instruction was repeated a few moments later. After exceptions to the instructions were taken, the jury was called back to the courtroom and the following additional instruction was given:

"With reference to Mr. Phelps, I commented upon Mr. Phelps, the Wenatchee, Washington, lawyer. I want to add that whatever I said concerning the fact that a person who in good faith contacts a lawyer and gets bad advice may rely on that bad advice, if he has honestly and in good faith divulged all the facts to him. That would apply not only to the first eight counts but also to the two conspiracy counts as far as Mr. Smith is concerned * * *"

toward appellants and their defense, giving instructions which unfairly commented upon the evidence and giving instructions which, considered in their entirety, unduly favored the Government. The necessary effect of these errors considered in totality, Smith argues, was to deny him a fair trial by jury.

A federal trial judge, as has many times been said, is more than a moderator or umpire. He has the responsibility to preside in such a way as to promote a fair and expeditious development of the facts unencumbered by irrelevancies. He may assist the jury by commenting upon the evidence and this may include an appraisal of the credibility of witnesses, providing the comment is fair and the jury is clearly instructed that they are to find the facts and may disregard such comments.

In fulfilling this responsibility during the stress of a criminal trial, few, if any judges can altogether avoid words or action, inadvertent or otherwise, which seem inappropriate when later examined in the calm cloisters of the appellate court. But unless such misadventures so persistently pervade the trial or, considered individually or together, are of such magnitude that a courtroom climate unfair to the defendant is discernible from the cold record, the defendant is not sufficiently aggrieved to warrant a new trial.

No useful purpose will be served by outlining and discussing each trial incident of which complaint is made. Some of the instances in which the judge took a personal hand in the proceedings undoubtedly proved helpful to the prosecution, others unquestionably aided appellants. Perhaps most judges would have taken a less active role in the trial. But the role which was here taken was not such as to constitute a substantial and unwarranted interference with counsel in the presentation of their cases, nor does it appear to us that the judge was biased.

A review of the entire record convinces us that the judge did not participate in the proceedings in such a way as to deprive appellants of a fair trial by jury.

Smith complains of the refusal of the court to give his requested instruction to the effect that testimony showing a good character may alone be sufficient to create a reasonable doubt and require a verdict of not guilty.[9] Instead, the court instructed that the fact of Smith's good character is for the jury to consider with other facts concerning him because that testimony, like other testimony, may generate a reasonable doubt as to Smith's guilt, justifying an acquittal.[10]

As appellant concedes, the refusal to give the requested instruction and the

---

9. The requested instruction reads as follows:

"* * * The defendant L. M. Smith has produced evidence of his good character as an honest and law-abiding citizen. This evidence has not been rebutted or contradicted.

"Mr. Smith's good character is relevant in determining whether it is probable that he is guilty as charged, and you must give it due weight and consideration in your deliberations.

"Testimony showing a character for honesty and integrity may alone be sufficient to a create a reasonable doubt and require a verdict of not guilty, although without it the evidence might otherwise be convincing."

10. The instruction which was given reads as follows:

"Mr. Smith has presented evidence of his good character and as an honest and law-abiding citizen. This is a fact for you to consider with other facts concerning Mr. Smith because that testimony, like other testimony, may generate in your mind a reasonable doubt as to the guilt of Mr. Smith, justifying an acquittal, since the jury may think it improbable that a person of good character would commit the crimes with which he has been charged. However, if, after weighing all of the evidence, you are convinced beyond a reasonable doubt that Mr. Smith is guilty of the crimes charged against him in one or more counts, it will be your duty to find him guilty, notwithstanding the fact that he is or was a person of good character."

form of the instruction which was given accord with the rule in this circuit.[11] This is also the established rule in the second and third circuits.[12] On the other hand, the seventh, tenth and District of Columbia circuits follow a rule which would call for the giving of the requested instruction.[13]

In Edgington v. United States, 164 U.S. 361, 17 S.Ct. 72, 41 L.Ed. 467, the Supreme Court reviewed a trial court instruction to the effect that evidence of good character could be considered only if the rest of the evidence created a reasonable doubt of the defendant's guilt, and that if their mind hesitated on any point as to the guilt of the defendant, then they had the right and should consider the testimony given as to his good character.

This instruction, which was far more restrictive than the one given in our case, was held to be erroneous, the Supreme Court saying, at page 366, 17 S.Ct. at page 73:

> " * * *, the decided weight of authority now is that good character, when considered in connection with other evidence in the case, may generate a reasonable doubt. The circumstances may be such that an established reputation for good character, if it is relevant to the issue, would alone create a reasonable doubt, although without it the other evidence would be convincing."

In the later case of Michelson v. United States, 335 U.S. 469, 476, 69 S.Ct. 213, 93 L.Ed. 168, the Supreme Court construed its earlier opinion, saying:

> " * * * This privilege is sometimes valuable to a defendant for this court has held that such testimony alone, in some circumstances, may be enough to raise a reasonable

doubt of guilt and that in the federal courts a jury in a proper case should be so instructed * * * (citing Edgington)."

We do not regard the language just quoted as a mandate to give such an instruction in every criminal case where testimony of good character is received. The limiting word "proper" indicates to us that some measure of discretion is left to the trial court in determining whether to do so. If, for example, some trial incident, or some remark made by the prosecution during argument, could lead the jury to believe that testimony of good character is only "make-weight" and could not, of its own force, create a reasonable doubt, a corrective instruction utilizing the quoted language of the Supreme Court would be appropriate and might even be required. In the case before us, no circumstance of this kind is called to our attention.

Absent a special reason for giving the "such testimony alone" form of instruction, we think that an instruction of the kind given here fairly and adequately advises the jury on the point, and fully accords with the underlying principle announced in the Edgington and Michelson cases. Instructing the jury that good-character testimony, "like other testimony," may generate a reasonable doubt as to guilt, justifying an acquittal, is in substance the same as saying that good-character testimony "alone" may be sufficient to create such a doubt.

The danger in using the word "alone," when not required to meet a special trial problem, is that the jury may mistakenly take it as an invitation to consider good-character evidence to the exclusion of all other evidence. As this court said in Baugh v. United States, 9 Cir., 27 F.2d 257, 261, such an instruction " * * *

11. Alvercz v. United States, 9 Cir., 282 F.2d 435, 438; Kasper v. United States, 9 Cir., 225 F.2d 275, 278; Baugh v. United States, 9 Cir., 27 F.2d 257, 261.

12. United States v. Lowenthal, 2 Cir., 224 F.2d 248, 249; Ridenour v. United States, 3 Cir., 14 F.2d 888, 892.

13. United States v. Donnelly, 7 Cir., 179 F.2d 227, 233; Miller v. United States, 10 Cir., 120 F.2d 968, 971; Villaroman v. United States, 87 U.S.App.D.C. 240, 184 F.2d 261, 263, 21 A.L.R.2d 1074.

would be to accentuate and give undue prominence to what after all is but one of many circumstances in evidence."

The trial court did not err in refusing to give the requested instruction relating to testimony as to good character.

 Smith specifies as error the denial of his motion made before trial, that the phrase "to the effect" be stricken from each of the first eight counts of the indictment as prejudicial surplusage. It was in these counts that Smith was charged with the making of false statements in violation of 15 U.S.C.A. § 714m (a). The use which was made of the criticized phrase in each of these eight counts is illustrated by the use made of it in the ninth paragraph of the first count, quoted in the margin.[14]

It is argued that by leaving this phrase in the indictment in each of the first eight counts the result was either (1) that the charge itself was that Smith had made statements which *could* be interpreted by others as meaning that he was the "sole owner," or (2) that the implication was permitted to be made to the jury that all the Government needed to show was that Smith used words which *could* be interpreted by the jury as meaning that he was the "sole owner." Smith points out that in his final argument the prosecutor specifically referred to this language in the indictment, saying:

> "Our indictment says that his statement was to the effect that he was the sole owner, and I submit to you that that is true."

In our opinion, the words "to the effect" do not have the connotation Smith attributes to them. The Government utilized this method of alleging that a variety of false statements was made, none of which were set out verbatim in the indictment, but all of which were generally described as statements which conveyed the meaning that Smith was the sole owner.[15] The Government did not,

14. "9. That in connection with these negotiations and as a part thereof the defendant LAURENCE M. SMITH, for the purpose of influencing the action of the Commodity Credit Corporation and to obtain money and other things of value under the Commodity Credit Corporation Act, did knowingly, on or about April 26, 1956, within the city of Portland, Oregon, and the jurisdiction of this court, cause to be made to the Commodity Credit Corporation through the Portland Commodity Office, Commodity Stabilization Service, a false statement in an application for approval of certain warehouse facilities, to-wit, Commodity Credit Corporation Form #24, said false statement being to the effect that the defendant LAURENCE M. SMITH was the sole owner of the Three State Warehouse Company, whereas in truth and in fact the Three State Warehouse Company was at that time a partnership owned by LAURENCE M. SMITH, EARL C. COREY and Willard A. Richards."

15. The reason why the Government elected to make reference to the alleged false statements by means of this general description, rather than by setting out the asserted false statements verbatim, is apparent when the instruments in which the statements were made are examined. For example, in Count I it was alleged that a false statement "to the effect" that Smith was the sole owner of the Three State Warehouse Company was made in an application dated April 26, 1956, for approval of certain warehouse facilities, made out on Commodity Credit Corporation Form No. 24. This instrument was introduced as Government Exhibit 1. On line 11 of that form, places were provided for the applicant to indicate, by a check mark, whether the facility was operated by a corporation, individual or partnership. Smith checked the place indicating the operation was by an individual. In line 13, calling for the names and titles of all persons authorized to execute agreements, Smith gave only his own name and gave, as his title, "Owner." In line 14, calling for the names and titles of all persons authorized to issue warehouse receipts, Smith gave his own name, and his title as "Owner;" and also gave the name of Con Jacobsen "Mgr." with the title "Supt." The application was signed, "L. M. Smith dba Three State Warehouse Co., (Applicant), by L. M. Smith, Owner (Title).

In proof of the allegation under Count III, that on April 25, 1956, Smith had made a false statement to the effect that he was the sole owner of the Three State Warehouse Company, in a statement showing assets and liabilities made out on Commodity Credit Corporation Form No. 68, Government Exhibit 3 was introduced.

in those counts, undertake to charge that the exact words constituting the false statement were, "I am the sole owner."

Smith was not prejudiced by the failure to set out the exact words of the false statements in the indictment as the words relied upon were contained in documents which were specifically described in the indictment. There was no claim of surprise and there was no surprise.

Any possibility that the jury might take the phrase "to the effect" as permitting conviction merely on a showing that the actual statements were *subject to* the interpretation that Smith was the sole owner, or that from them the Commodity Corporation officials assumed that he was the sole owner, was foreclosed by the explicit instructions given by the trial court.[16]

■ Smith also argues that the instruction quoted in note 16 is erroneous because, whereas the Government was required to prove that Smith used the words "sole owner," this instruction advised the jury that they could convict without finding that Smith used those exact words.

This argument again reflects a misunderstanding of the indictment. Smith was not charged with making a false statement, to-wit, "I am the sole owner." He was charged with making false statements to the effect that he was the sole owner. The instruction was entirely consistent with the charge. Nor, in view of

the context, could use in this and other instructions of the word "represented" instead of "stated," have misled the jury into considering the charge as one of fraudulent misrepresentation.

At the close of the Government's evidence in chief, Smith moved for dismissal of the first eight counts on the ground that the evidence did not show any false statement. The motion was denied. The same motion was made and denied at the close of all the evidence.

Assigning the denial of these motions as error, Smith argues that as to the first eight counts the use of the phrase "to the effect" left the counts so vague, uncertain and indefinite that they failed to charge any ultimate fact against Smith. For the reasons already indicated we hold that the counts were not defective in this respect.

As an additional ground for challenging the denial of these motions, Smith contends that the evidence was insufficient to support a verdict of guilty. He argues that the proof went no further than to produce an opportunity for speculation and conjecture. "The forms filled out by Smith," he asserts "nowhere called upon him in any instance to specifically state whether or not he was the 'sole owner' and he did not so state."

Insofar as this may be a continuation of the argument that the Government was required to prove that the exact form of the false statement was "sole owner,"

On the first page of the form there are three boxes to be filled in, one if the applicant is a corporation, another if the applicant is a partnership, and a third if the applicant is an individual. Smith filled in the box for individuals, leaving the partnership box blank, although the company was a partnership at that time. He signed the statement with just his signature although these directions were printed on the signature page: "Be certain to use corporation or partnership style in signing statement, if a corporation or partnership."

It would have added greatly to the length of the indictment to set out, in verbatim form, not only the allegedly false statements but also the context in which they appeared in order to demonstrate

that the statements were false because of the context.

16. The instruction as to this reads as follows:

"However, in order to find that the Defendant Smith represented that he was the sole owner on one or more of these documents, it is not necessary that the documents use the words 'sole owner' or that the defendant wrote or caused to be written the words 'sole owner.' You may find that the Defendant Smith represented in a particular document that he was the sole owner if you find that the words that were printed in the document itself and the words written or caused to be written by the Defendant Smith permitted no interpretation other than that Smith was the sole owner."

we have already indicated our reasons for holding otherwise. But Smith also seems to be arguing that the jury was not warranted in finding, from the way in which the forms were filled out and signed, that the only possible interpretation was that Smith had, in effect, stated that he was the sole owner.

Since the sentences as to each of the counts run concurrently with each other and concurrently with the sentence imposed on Count I, Smith cannot prevail on this argument unless he can show that the evidence was insufficient as to all eight counts. In our opinion it was sufficient as to all counts, although it was more conclusive as to some than to others. See note 15 where the basis for Counts I and III is discussed.

All of Smith's remaining specifications of error relate to his conviction under Counts IX and XI, the conspiracy counts. Since the sentences on the conspiracy counts were concurrent with those on the substantive counts, Counts I to VIII, directed against Smith, it is unnecessary for us to consider whether error was committed as to those counts.

Several of Corey's specifications of error relate to his conviction, under Count X, of a violation of the conflict of interest statute, 18 U.S.C. § 434. We first review the evidence bearing upon this conviction.

Corey was appointed director of the Portland office of Commodity in January, 1955. The duties of the office were described in 20 F.R. 8788, November 30, 1955.[17] They were described in a great deal more detail in an official job-description document issued by the Department of Agriculture.[18]

Until about August, 1955, it was Corey's practice to personally execute grain storage agreements with warehousemen. A memorandum was then issued by the Deputy Administrator of the Commodity Stabilization Service, entitled, "Change in Policy with Respect to Storage Contract Agreements." It was stated in this memorandum "that the Director may redelegate contract approvals on storage and handling of CCC-owned commodities to an appropriate and responsible person within the CCC office. * * * "

On August 26, 1955, acting pursuant to this memorandum, Corey redelegated authority to execute storage contracts requiring the signature of a contracting officer. At that time Corey also redelegated authority to execute contracts as representatives of the Secretary.

The officers who had received redelegations of authority from Corey had authority to exercise, and did exercise, independent discretion in entering into contractual obligations on behalf of Commodity. It was not necessary for them

17. This regulation reads in part:
"C. Directors of Divisions and CSS Commodity Offices. Under the general supervision and direction of the Administrator or of the Deputy Administrator who has been specifically assigned responsibility for direction of the programs and activities involved, the directors of all divisions of the CSS and directors of all CSS commodity offices are authorized to execute contracts, agreements and other documents; settle and adjust CCC claims within limitations established by the Commodity Credit Corporation; and perform any other actions necessary to the performance of their assigned functions and responsibilities. * * * "
18. This job description reads in part:
" * * * Interprets and adapts national programs to meet local and area conditions. These encompass (1) method of executing agricultural programs, (2) CCC pricing policies under assigned programs, (3) disposal and acquisition policies such as when, at what prices, what quantities, and what qualities of commodities should be released or acquired, (4) sales and purchase specifications on requirements of CCC, (5) storage requirements including methods of handling, storing, and protecting commodities owned by the corporation, and (6) methods for adjusting CCC operations to the maximum extent practical with trade practices. In adapting programs to meet area conditions the Director determines those commodities or groups of commodities which should be reconcentrated, bought, sold, held in storage, and diverted for other uses or determines that these activities should not be activated because of effects of such actions on commodity markets or other segments of the agricultural economy of the area. * * * "

to consult with or secure the approval of Corey or any other Government officer before negotiating and signing such contracts for Commodity. Under this organizational setup the business of Commodity with respect to approval and inspection of warehouses, grain storage contracts, concentration or removal of grain in particular warehouses and financial settlements was transacted for the most part in a routine manner by others than the director and without orders or interference by the director.

The fact, however, that contracts were executed and other business relating to grain storage was conducted by subordinates of the director without his specific direction or concurrence in each instance does not mean that the director was freed of all duties which could affect the terms and conditions of warehouse contracts, the negotiating of such contracts, and profits derived thereunder.

In the redelegation memorandum it was provided that the overall responsibility of the director, " * * * included the delegated responsibility for contract approvals, even if it were further redelegated to some other appropriate and responsible individual within the office."

It appeared that while acting as director of Commodity, Corey frequently participated in telephone conferences, usually in the presence of the heads of the departments, relating to the movement of grain into and about the Portland area. The directors of the various commodity offices also assisted in the negotiation of the warehouse rates, hence the profits earned by each warehouse were in part determined by the director.

The trial court instructed the jury, in effect, that Corey could be convicted under the conflict of interest statute if he was a partner in Three State Warehouse Company, was employed as an officer or agent of the United States as head of an office which did business with that company, and if he knew that the company was doing business with the office over which he had charge. The trial court also advised the jury that, under the circumstances, it was not necessary for the Government to show that Corey physically executed one or more of the contracts between Commodity and the warehouse company, or that he engaged in negotiations looking towards the execution of these contracts.

Counsel for Corey objected to the giving of this instruction on the ground that

" * * * to violate that statute it is necessary that an officer or agent of the Government himself be employed to transact business with a concern which he has an interest in or that he act in the transaction of the business, and that if the business is conducted by others in the department to whom he does not give any particular instructions with regard to that business, then, he has removed himself from the vice dictated by the statute and he would not be guilty."

The giving of this instruction, and the refusal to give an instruction tendered by Corey which would have advised the jury in accordance with the quoted objections, are specified as error.

■ The question presented is whether an officer or agent of the United States who is the administrative head of an office which to his knowledge negotiates and enters into contracts with a particular business entity, but who does not personally participate in such negotiations or the execution of such contracts, and who does not give any particular instructions with regard to those dealings to his subordinates who carry on such dealings under blanket authority, may be found to have engaged in "the transaction of business" with such entity, within the meaning of the conflict of interest statute, 18 U.S.C., § 434.

In United States v. Mississippi Valley Co., 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268, the Supreme Court observed that § 434 "speaks in very comprehensive terms," unrestricted "by numerous provisos and exceptions, as is true of many penal statutes" (page 549, 81 S.Ct. page 308); that the "obvious purpose of the

statute is to insure honesty in the Government's business dealings by preventing federal agents who have interests adverse to those of the Government from advancing their own interests at the expense of public welfare," (page 548, 81 S.Ct. page 308); and that the "statute is thus directed not only at dishonor, but also at conduct that tempts dishonor." (page 549, 81 S.Ct. page 308).

Having in view these legislative objectives, we think the statutory words "the transaction of business" were intended to include any official role played by an officer or agent of the United States, in connection with the dealings between a Government agency and a business entity, which reasonably could have been utilized to advance personal pecuniary interest to the disadvantage of the United States.

The official role depicted in the challenged instruction is one which reasonably could be utilized for such a purpose. The administrative head of a Government office who knows that subordinates in the office, subject to his control, are dealing with a particular business entity is in a position to benefit that company to the detriment of the Government, by the giving or withholding of general or specific instructions. Whether he actually gives or withholds instructions for that purpose is immaterial.[19]

Under the facts of a particular case the connection which the head of an agency has with the dealings the agency carries on with a company may be so remote and tenuous that ultimate responsibility plus knowledge are not alone sufficient to warrant a finding that the official engaged in "the transaction of business." [20] Corey did not request that a qualification of this kind be incorporated in the instruction which was given, nor did he object to the instruction on the ground that no such qualification was added. Such a request or objection would, in fact, have been inconsistent with his position that under no circumstances could Corey be found guilty unless he personally engaged in the negotiations for and execution of the warehouse contracts.[21]

19. It follows from this that we do not agree with the following statement contained in the report, Conflict of Interest and Federal Service, Harvard University Press, 1960, at page 43, if it is therein implied that the statute requires only that an official "step aside":

"* * * it is essentially, though not in words, a disqualification statute, not forbidding the employee to hold the outside interest, but requiring him to step aside from any official dealings with the entity in which he has the interest * * *"

The holding of a personal pecuniary interest which places a Government official in a position where he must "step aside," may operate to deprive the Government of supervisory service the lack of which will benefit the private company to the disadvantage of the Government.

20. This is probably what the Attorney General had in mind when he made the following statement in an opinion rendered in connection with the nomination of Neil H. McElroy for Secretary of Defense, Hearing before Senate Committee on Armed Services, 85th Cong. 1st Sess. pages 12–14:

"Although personal action on the part of the Secretary might pose a serious conflict of interest problem under section 434, I know of no judicial decision suggesting that the existence of ultimate official responsibility for all the activities of a department constitutes per se the 'transaction of business' within the meaning of section 434. Moreover, neither the express language of the section nor its legislative history are indicative of such a result."

It will be noted that the Attorney General does not express an opinion as to what the rule would be if there was also added the fact of knowledge that such transactions were being carried on.

21. It is also possible that the reason no such instruction was requested was that on several occasions Corey had taken action which had a substantial pecuniary effect on the company, hence that such an instruction would be unlikely to assist Corey. The following are illustrations of some of the actions taken by Corey which might be said to "tempt dishonor":

(1) On January 10, 1957, the chief of the field operations division of the Portland Commodity Office directed a memorandum to Corey stating in part: "Now that the space situation has changed to the point where there is actually a surplus of conventional facilities, it is our recom-

We therefore hold that the questioned instruction was not erroneous and that the court did not err in refusing to give the requested contrary instruction.[22]

Corey contends that the court erred in instructing the jury that:

"As a general rule, whatever a person is legally capable of doing can be done through another as an agent. Hence, if the acts of an employee or other agent are ordered or directed or authorized or consented to by a defendant, the law holds the defendant responsible for such acts as though personally committed by him."

This instruction is criticized on two grounds: (1) the doctrine of respondeat superior is not applicable in a criminal action such as this and, (2) there was no evidence that the officials who dealt with Three State Warehouse were Corey's employees or agents.

The quoted words, standing alone, are subject to the construction, which would be inaccurate, that Corey's subordinates in the Portland Commodity office were his personal agents and employees. Read in context with what immediately preceded and followed the quoted words, however, it will be seen that the trial judge was not speaking of Corey's personal employees or agents but only of the fact that he had direction and control over his subordinates in the Portland Commodity office. Just before using the quoted words, the judge had given the instruction which has been discussed above, in which one of the essential elements in order to convict was said to be Corey's knowledge that Three State Warehouse Company was doing business

---

mendation that consideration be given to the removal of our stocks from these [temporary] facilities prior to that stored in permanent, conventional granaries." Attached to this memorandum was a list of the "temporary" facilities, and on this list was Three State Warehouse Company. At the trial the official who sent this memorandum testified that to his knowledge, no action was taken to implement the suggestion that temporary facilities be unloaded first. Had this recommendation been followed it would have adversely affected the economic position of the company in which Corey was financially interested.

(2) On July 23, 1958 Corey called the Director of the Minneapolis office of Commodity and requested that certain wheat be shipped from Montana to the Portland area. A confirming telegram was then sent from the Portland office over the initials of Corey, reading in part as follows: "All proteins running from 10 to 11.50, bill direct to CCC, % Three State Warehouse, Bell Station, Portland, * * *" The Director of the Minneapolis office testified that no grain was shipped in response to the request, because "When we analyzed the wire, we found that none of these elevators wanted to ship * * *" He further testified "Q. In your practice, is it usual or unusual that a specific warehouse be named as a recipient of the grain? A. It is rather unusual. It has been done, but very seldom."

(3) At a time during which Three State Warehouse Company, among others, was being filled with Government grain, a large number of ships of the federal reserve mothball fleet was being unloaded. As studies indicated that grain could be satisfactorily stored in ships at a cost which was but 1/12th of the cost of storage in private commercial facilities, an independent audit of the Department of Agriculture resulted in a recommendation being made by the auditors to Mr. Corey that the unloading of the ships be discontinued. Mr. Corey declined to follow this suggestion, stating that he would not do so and furthermore that the question of inventory management was a matter of his responsibility and not that of the auditors.

Corey directs attention to evidence which tends to minimize his personal participation in these transactions, but the evaluation of this evidence was for the jury. He also refers to evidence and advances arguments bearing upon the wisdom of his personal action in these matters, but this is immaterial.

22. Corey also moved for acquittal at the close of all the evidence, partly on the ground that there was no evidence of Corey's personal participation in transactions between Commodity and Three State Warehouse Company. The trial court did not err in denying this motion.

with the office "over which he had charge."

Immediately after making the criticized reference to "agent" and "employee," the trial judge instructed:

"For example, it is not necessary to show that the Defendant Corey physically executed one or more of the contracts between the Commodity Credit Corporation and the Three State Warehouse Company, or engaged in negotiations looking toward the execution of these contracts, if he knew that such negotiations were being conducted and such contracts were being entered into by employees of the Portland Commodity Office under his direction and control, and if such employees were performing these acts with his knowledge and consent. In other words, the fact that these transactions were being handled in a routine manner by employees of the Portland Commodity Office, who had no knowledge of Defendant Corey's interest in Three State Warehouse Company, would not exonerate Defendant Corey of any liability which he might otherwise have, provided you find that these negotiations were being conducted and the contracts were being entered into with Corey's knowledge and consent."

During the colloquy which occurred between court and counsel while Corey's counsel was voicing his objection to this particular instruction the court indicated that by his reference to a man's liability for the acts of his agent, he had in mind only Corey's responsibility for office subordinates who were under his direction and control.

The court offered to instruct the jury that "these two statements that I made mean the same thing." Counsel for Corey indicated, however, that he would not be satisfied with this, because of his broader position that Corey would not be guilty in any event unless he personally participated in the transaction. Accordingly, no such additional instruction was given.[23]

We have already expressed the opinion that it was proper to instruct that one who is the head of a Government office which, to his knowledge, does business with a business entity, may be found to have transacted business with that office without the necessity of showing his personal participation in the dealings. This is because, under these circumstances, the jury may conclude that he ordered, directed, authorized or consented to the dealings which his office subordinates carried on with the business entity. In substance that is the meaning conveyed by the entire instruction, read as a whole.

We conclude that the trial court did not err, to Corey's prejudice, in giving this instruction.

Corey's remaining specifications of error deal with the conspiracy counts which we need not consider for the same reason stated with reference to Smith's appeal.

In this opinion we have dealt with every argument by each appellant which, in our view, is of enough substance to warrant discussion. The few arguments which have not been discussed have nevertheless been considered, but have been found to be without merit.

The judgments, and the orders denying the motions for a new trial, are affirmed.

---

23. The jury was called back for some additional instructions on other matters. When the court completed these it inquired, "Is there anything else, counsel?" Counsel for both appellants answered, "No."