UNITED STATES of America,
Appellee,

v.

Birdie Louise Joshua HARRIS,
Appellant.

UNITED STATES of America,
Appellee,

v.

Billy Charles HARRIS, Appellant.

Nos. 73-1923, 73-2163.

United States Court of Appeals,
Ninth Circuit.

July 24, 1974.

Rehearing Denied Sept. 25, 1974.

**2**

Joseph T. Vodnoy, Los Angeles, Cal., for Birdie Harris.

Morton Boren, Los Angeles, Cal., for Billy Harris.

John K. Cameron, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before ELY and KILKENNY, Circuit Judges, and ENRIGHT, District Judge.*

OPINION

ELY, Circuit Judge:

The appealing defendants were tried together, each being charged with four counts of violating 21 U.S.C. § 841(a)(1). Counts One and Two charged that, on January 22, 1973, both Birdie Harris and Billy Harris [1] knowingly and intentionally possessed 19.05 grams of heroin with intent to distribute it, and that they knowingly and intentionally distributed that substance. Counts Three and Four similarly charged that, on February 8, 1973, both defendants possessed with the intent to distribute, and that they distributed, 352.1 grams of heroin. After pleading not guilty, both Birdie Harris and Billy Harris were convicted by a jury on all four counts. A brief summary of the facts, in the light most favorable to the

* Honorable William B. Enright, United States District Judge, San Diego, California, sitting by designation.

1. The two appellants are not related.

Government, follows. *See* Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

The prosecution's case was primarily based upon the testimony of an informant, John Durden. The first transaction was arranged by Durden in a telephone conversation with Billy Harris. Durden expressed a desire to purchase an ounce of heroin and was told to come to a house in Inglewood, California. Durden and John Jackson, an undercover agent of the Bureau of Narcotics and Dangerous Drugs (hereinafter "BNDD"), drove to the Inglewood address. Although both Jackson and Durden entered the house, Jackson remained in the kitchen while Billy Harris and Durden proceeded to a rear bedroom. Birdie Harris, who was already present in the bedroom when Billy Harris and Durden arrived there, offered Durden one contraceptive full of heroin. Durden explained that his friend, Jackson, had the money, and he walked back to the kitchen. After obtaining the purchase money from Jackson, Durden returned to the bedroom and completed the purchase.

The second sale occurred on February 8, 1973, again being prearranged in a telephone conversation between Billy Harris and Durden. Since Durden had previously expressed an interest in purchasing a substantial amount of heroin, Billy Harris informed him on February 9th that a substantial sale could be ef-

fected on that day. Agent Mueller of the BNDD drove Durden to the Inglewood residence, but on this occasion Durden entered the house alone. Although there were six people in the house, the sale was conducted in the same manner as the first sale. Billy Harris first motioned Durden to accompany him to the rear bedroom. Again, once in the bedroom, Birdie Harris handed Durden the substance, although on this occasion the transaction involved the purchase of twenty contraceptives of heroin. Durden explained to Birdie Harris and Billy Harris that it would be necessary that he telephone a friend for the requisite purchase money, but instead, by means of a prearranged signal, he informed agents of the BNDD over the telephone that the heroin had been transferred.

Federal agents then approached the house and entered without first obtaining an arrest or search warrant. As the agents approached, Durden placed the contraband in a kitchen cabinet. All of the occupants of the house were arrested, including Durden. While being arrested, Durden informed one agent that the heroin was concealed in the kitchen.[2]

Later that evening, the agents procured a search warrant based on the affidavit of agent Jackson. The affidavit contained only such facts as were known to Jackson prior to the agents' entry into the house.[3] During the subsequent

2. There was conflicting evidence over the manner in which Durden informed the federal agent that the heroin was in the kitchen. Durden testified that he vocally told the agent that the heroin was concealed in the kitchen. The agent testified, however, that Durden only indicated the kitchen area by a nod of his head and that Durden intentionally remained silent so as not to disclose to the other suspects his capacity as a government informant.

3. The affidavit of agent Jackson contained the following:

"I have been informed by other BNDD agents as follows:

"They were informed of the following facts by a confidential reliable informant,

who has provided information in the past which has led to at least ten separate prosecutions and convictions:

"On February 8, 1973, this informant had a conversation with Billy Charles Harris concerning the purchase by the informant from Harris of a quantity of heroin. About 8:00 P.M. this day Harris told the informant that a quantity of heroin was then inside a house whose address was 9712 11th Avenue, Inglewood, California.

"A BNDD agent then drove the informant to this house and waited by a telephone booth while the informant went inside. Shortly afterwards the informant telephoned the waiting agent and told him he had seen a quantity of heroin inside

**4**

search of the house, the agents discovered and seized from a kitchen cabinet approximately 352 grams of heroin.

At trial, John Durden was the principal government witness. His testimony was crucial to the prosecution's case since, although Durden was searched for contraband by federal agents prior to each transaction, he was the only government witness to both of the sales. Since Billy Harris testified that the money given to him by Durden was in payment for gambling debts and that the alleged heroin sales did not occur, Durden's credibility was a decisive issue.[4]

The first contention urged upon us here is that the trial court abused its discretion when it refused to grant Birdie Harris a continuance in order that her newly retained private counsel could prepare for trial. Originally, counsel for Birdie Harris was appointed from the Federal Public Defender's office, on February 9, 1973, at the time the complaint was filed. A trial date of April 17th was set, but the trial was postponed for one day when Billy Harris was not present on the 17th. Not until the morning of April 18th did Birdie Harris inform the court that she and her appointed counsel were incompatible.[5] She informed the court that on the previous evening she had retained private counsel, a Mr. Gordon, and that she desired a short continuance. Since Birdie Harris had delayed, without a rational explanation, until the morning of trial to inform the court of

her desire to retain private counsel, the court refused to grant her motion for a continuance. After the jury had been selected and impaneled, the trial was adjourned until the following morning. The court apprised Birdie Harris that Mr. Gordon could be substituted as her attorney if he were present the next morning.

On Thursday, April 19th, Birdie Harris repeated her objections to proceeding to trial with her appointed counsel after explaining that Mr. Gordon was no longer available. The court granted a half-hour recess, suggesting that another attorney could be provided from the Public Defender's office. After the recess, one Vodnoy appeared and stated that he had been retained as private counsel by Birdie Harris. The court permitted Vodnoy to be substituted as counsel for Birdie Harris, but clearly explained that it was allowing the substitution on the condition that the trial would not be further delayed. Because Mr. Vodnoy had a matter pending in the state court on that day, the trial court continued the trial until the next morning. When the trial recommenced on Friday, defense counsel moved for a further continuance until Monday so that he could have more time to prepare for trial. The motion was denied. Birdie Harris contends that she was denied effective assistance of counsel by the trial court's action.

■■ The grant or denial of a motion for continuance rests within the

---

the house. I know that in at least three of the ten prior convictions which the informant has helped bring about he has identified material as heroin which later laboratory analysis has indeed shown to be heroin."

After a description of the premises, the affidavit concludes:

"As [a] Special Agent in the Bureau of Narcotics and Dangerous Drugs it is my experience that contraband substance (heroin) is usually moved during the late hours of the evening and early morning hours. Because of this I feel that the contraband should be secured by whatever means possible.

"I am also informed by a reliable informant that the contraband substance is in fact located in the residence . . . . ."

4. Although a tape-recording of a telephone conversation between Durden and Billy Harris was introduced, that conversation did not include the term "heroin." Instead the term "wigs" was utilized. Both Billy Harris and his wife testified that the conversation related only to the purchase of wigs from the store owned by Harris and his wife.

5. Apparently Birdie Harris was of the opinion that her attorney desired that she plead guilty and that, therefore, he would not represent her effectively at trial.

sound discretion of the trial judge, and his decision will not be reversed absent a clear abuse of that discretion. Avery v. Alabama, 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377 (1940); Daut v. United States, 405 F.2d 312 (9th Cir. 1968), cert. denied, 402 U.S. 945, 91 S.Ct. 1624, 29 L.Ed.2d 114 (1971); Torres v. United States, 270 F.2d 252 (9th Cir. 1959), cert. denied, 362 U.S. 921, 80 S.Ct. 675, 4 L.Ed.2d 741 (1960). This court has previously held that a trial court properly acts within its discretion when it refuses to allow substitution of counsel on the eve of trial. United States v. Price, 474 F.2d 1223 (9th Cir. 1973); Good v. United States, 378 F.2d 934 (9th Cir. 1967); cf. Brown v. Craven, 424 F.2d 1166 (9th Cir. 1970). In Bailey v. United States, 282 F.2d 421 (9th Cir. 1960), cert. denied, 365 U.S. 828, 81 S.Ct. 713, 5 L.Ed.2d 705 (1961), we rejected a similar contention to that here urged. There, too, the trial court permitted substitution of counsel on the condition that no delay would result thereby. Although Birdie Harris was represented by an attorney from the Public Defender's office for approximately two months, she did not inform the court of any dissatisfaction until the day of trial. The trial court permitted substitution of counsel on Thursday but clearly explained that the trial would resume on Friday. Under these circumstances, we are not persuaded that the trial court abused its discretion. See United States v. Simmons, 457 F.2d 763 (9th Cir. 1972).

Next, appellants, although conceding that the affidavit in support of the search warrant was facially sufficient to establish probable cause, argue that the trial court improperly refused to conduct an evidentiary hearing to test the accuracy of the affidavit. At trial, during their motion to suppress, the appellants contended that the affidavit in support of the search warrant was misleading in that it failed to disclose material facts. They claimed that the agents initially entered the house to arrest the occupants without first announcing their authority and purpose, as required by 18 U.S.C. § 3109.[6] Appellants' contention is based on the premise that if the trial court had determined after a hearing that the appellants were illegally arrested, then the evidence subsequently seized pursuant to the search warrant would have been inadmissible. The trial court refused to conduct a hearing, ruling that it was impermissible for a trial court to inquire into the accuracy of a search warrant affidavit.

The Government stipulated that the agents had not procured arrest or search warrants prior to their initial entry into the Inglewood residence. It is clear that the criteria of section 3109 apply to forceful entries wherein the agents have not procured warrants in advance. Sabbath v. United States, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968); Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958); United States v. Bustamante-Gamez, 488 F.2d 4 (9th Cir. 1973), cert. denied, 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974).

We think that the trial court erroneously ruled that it was never permissible to inquire as to the accuracy of a search warrant affidavit. In United States v. Bolton, 458 F.2d 377, 378 (9th Cir. 1972), we explained:

> "As a general proposition, the legality of a search warrant depends upon the sufficiency of the underlying affidavit on its face and the question is whether the magistrate could determine the existence of probable cause upon the matter asserted in such affidavit." (Emphasis added; footnote omitted.)

6. 18 U.S.C. § 3109 provides:
"The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant."

**6**

In *Bolton,* 458 F.2d at 378 n. 6, we indicated, however, that when a defendant can make a substantial showing of falsehood or other imposition upon the magistrate, then the trial court is required to conduct a hearing concerning the truth of the facts asserted in the affidavit. Furthermore, we recently held in United States v. Damitz, 495 F.2d 50 (9th Cir. 1974) that under the facts there presented the trial court properly permitted a de novo determination of the veracity of the affidavit. *See* United States v. Carmichael, 489 F.2d 979 (7th Cir. 1973) (en banc);[7] *see also* Rugendorf v. United States, 376 U.S. 528, 531–532, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964).

■■ In the case at hand, however, we conclude that the appellants did not make the required initial showing. They neither asserted nor demonstrated that the alleged illegal conduct in any manner contributed to the subsequent discovery or seizure of evidence. When there has been illegal police conduct prior to the seizure of evidence, the admissibility of that evidence depends upon whether " 'the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963); *see* Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939); United States v. Cales, 493 F.2d 1215 (9th Cir. 1974); United States v. Bacall, 443 F.2d 1050 (9th Cir.), cert. denied, 404 U.S. 1004, 92 S.Ct. 965, 30 L.Ed.2d 557 (1971). Even assuming *arguendo* that the officers violated section 3109 in arresting the appellants initially, under the doctrine of Wong Sun v. United States, *supra,* the evidence seized pursuant to the search warrant was admissible. In these circumstances, the trial court was justified in refusing to conduct a hearing concerning the accuracy of the affidavit.

The appellants' third contention is that the trial court erred when it refused to admit into evidence a written statement of one Patricia Hamlin. Her statement reported an alleged conversation between Hamlin and Durden. In that conversation Durden purportedly stated that he was attempting falsely to implicate Billy Harris because he owed Harris a substantial sum of money for gambling debts.

Appellants first attempted to obtain Hamlin's testimony in court as to the contents of the conversation. As she was interrogated concerning her relationship with Durden, she began to testify as to her purported transactions with him involving heroin. At that point, the trial judge interrupted her testimony and advised her of her privilege under the Fifth Amendment not to testify. After a short recess in which Hamlin consulted with an attorney, she exercised that privilege. Counsel for appellants then attempted to introduce the written statement prepared by Patricia Hamlin, but the trial court excluded it on the ground that defense counsel had not warned Hamlin of her rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) before obtaining the statement. Since the Miranda warning is only required when

7. The Seventh Circuit, en banc, has recently considered the issue of a defendant's right to a hearing for the purpose of testing the credibility of Government agents whose affidavits are before the magistrate. The court held, in United States v. Carmichael, 489 F. 2d 979 (7th Cir. 1973), that a federal trial court is required to conduct an evidentiary hearing under certain circumstances:

"We now hold that a defendant is entitled to a hearing which delves below the surface of a facially sufficient affidavit if he has made an initial showing of either of the following: (1) any misrepresentation by the government agent of a material fact, or (2) any intentional misrepresentation by the government agent, whether or not material." 489 F.2d at 988. er or not material." 489 F.2d at 988.

The Seventh Circuit substantially adopted, with one modification, the proposal suggested in Kipperman, Inaccurate Search Warrant Affidavits as a Ground for Suppressing Evidence, 84 Harv.L.Rev. 825 (1971).

there is "custodial interrogation," however, Miranda v. Arizona, 384 U.S. at 444, 86 S.Ct. 1602; United States v. Bekowies, 432 F.2d 8, 12 (9th Cir. 1970), the trial court excluded the statement on an incorrect basis. Nevertheless, the statement properly could have been excluded as inadmissible hearsay evidence.

▮ Appellants argue, however, that the written statement, which implicated Hamlin in illegal narcotic activity, qualified as a declaration against her penal interest.[8] Under the current law of this Circuit, a statement is not admissible as an exception to the hearsay rule solely because it is against the penal interest of the declarant. United States v. Walling, 486 F.2d 229 (9th Cir. 1973); Scolari v. United States, 406 F.2d 563 (9th Cir.); cert. denied, 395 U.S. 981, 89 S.Ct. 2140, 23 L.Ed.2d 769 (1969); see Donnelly v. United States, 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820 (1913). Appellants, in apparent reliance on Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), contend that the exception must be invoked in this case. We disagree. In *Chambers*, "[t]he hearsay statements involved . . . were originally made and sub- sequently offered at trial under circumstances that provided considerable assurance of their reliability." 410 U.S. at 300, 93 S.Ct. at 1048.[9] Here, there were not sufficient guarantees of trustworthiness to render the statement admissible.[10] *See* United States v. Walling, 486 F.2d 229, 238–239 (9th Cir. 1973); *cf*. United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

Appellants' forth contention is that the trial court denied them their right effectively to cross-examine the Government informant, Durden. They specifically point to the court's permitting Durden to refuse to answer questions regarding his resident address. Although Durden disclosed his name, occupation, and business address, the trial court sustained the Government's objection to a question regarding his residence.[11] The Government, in challenging defense counsel's question, was silent as to the ground for its objection. Nor did the Government, at any time during trial, indicate that the informer believed he was in danger. Additionally, the trial court sustained objections to defense counsel's questions which attempted to demonstrate Durden's bias, prejudice, or motive.[12] The record is

---

8. Apparently the appellants intended to impeach Durden with the prior inconsistent statements allegedly made to Miss Hamlin. *See* McCormick, Law of Evidence, § 34 (1954).

9. The Supreme Court specified four factors which provided assurance of reliability for the extrajudicial statements: (a) the declarant's out-of-court confessions were made spontaneously, shortly after the murder occurred; (b) the confessions were corroborated by other evidence; (c) the confessions were "in a very real sense self-incriminatory and unquestionably against interest;" and (d) the declarant was present at the trial and available for cross-examination concerning the truthfulness of the extrajudicial statements. Chambers v. Mississippi, 410 U.S. at 300–301, 93 S.Ct. at 1048.

10. In fact, it is not clear that the statement qualifies as a declaration against interest under the proposed Federal Rules of Evidence since the portion of Hamlin's statement which reports the conversation with Durden in no way subjects Patricia Hamlin to criminal liability. See Rule 804(b)(4),

Proposed Rules of Evidence for United States Courts and Magistrates.

11. As defense counsel for Birdie Harris began his cross-examination of John Durden, the following occurred:
"Q. What is your home address?
MR. CAMERON: Objection, your Honor. That is irrelevant.
MR. VODNOY: Smith vs. Illinois, your Honor.
THE COURT: The objection is sustained.
MR. VODNOY: S[m]ith vs. Illinois. I move—

.    .    .    .    .

MR. VODNOY: Your Honor, I would move to strike this witness's testimony on the grounds I have been denied the right of confrontation of where he lived.
THE COURT: The objection is overruled, the motion is denied." [R.T. 171, 172.]

12. The court prevented defense counsel from asking the following questions:
"Q. Do you receive any consideration from the Government?

barren as to the reason the court deemed these inquiries improper.

Manifestly, the right of an accused to cross-examine the witnesses against him is embodied in the confrontation clause of the Sixth Amendment. Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L. Ed.2d 934 (1965). Indeed, "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." Davis v. Alaska, 415 U.S. at 316, 94 S. Ct. at 1110. In the present case, the cross-examination of the Government informant was of utmost importance since his reliability and credibility may well have determined the guilt or innocence of appellants. Smith v. Illinois, 390 U. S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968); see Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Although we recognize that the trial judge has wide latitude in the control of cross-examination, "this principle cannot be expanded to justify a curtailment which keeps from the jury relevant and important facts bearing on the trustworthiness of crucial testimony." Gordon v. United States, 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447 (1953); see United States v. Kartman, 417 F.2d 893 (9th Cir. 1969).

The Supreme Court, in Alford v. United States, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931) and again in Smith v. Illinois, 390 U.S. 129, 88 S.Ct. 748 (1968), has definitely established that the inquiry concerning the residence of a witness is not only proper but also essential to effective cross-examination. As the Court stated in Alford:

"The question 'Where do you live?' was not only an appropriate preliminary to the cross-examination of the witness, but on its face, without any such declaration of purpose as was made by counsel here, was an essential step in identifying the witness with his environment, to which cross-examination may always be directed." 282 U.S. at 693, 51 S.Ct. at 220.

The Court reiterated the principle expressed in Alford almost 40 years later in Smith v. Illinois:

"[W]hen the credibility of a witness is in issue, the very starting point in 'exposing falsehood and bringing out the truth' through cross-examination must necessarily be to ask the witness

A. Other than the expense, nothing.

Q. In other words, the Government has not dismissed criminal charges against you in exchange for your assisting the Government, is that correct?

MR. CAMERON: Objection, your Honor.

THE COURT: The objection is sustained.

. . . . .

Q. How come you are helping the Government?

MR. CAMERON: Objection.

THE COURT: The objection is sustained.

MR. VODNOY: Your Honor, this goes to bias.

THE COURT: The objection is sustained.

MR. VODNOY: I move to strike the witness's testimony on the grounds of being denied the right of confrontation.

THE COURT: The motion is denied.

. . . . .

Q. Have you had any cases pending at any time that you have testified for the Government?

MR. CAMERON: Objection.

THE COURT: Sustained.

Q. Are you appearing in this case as a good public spirited citizen ready to testify?

MR. CAMERON: Objection.

THE COURT: The objection is sustained.

Q. Do you have anything to gain by testifying against these defendants?

MR. CAMERON: Objection.

THE COURT: The objection is sustained.

MR. VODNOY: Your Honor, that goes to the very heart—

THE COURT: It does not, counsel. Now put a question which is proper.

MR. VODNOY: I would move to strike this witness's testimony on the grounds [that] I am being denied the right of confrontation.

THE COURT: That motion will be denied." [R.T. 163, 174, 179–80.]

who he is and where he lives. The witness' name and address open countless avenues of in-court examination and out-of-court investigation. To forbid this most rudimentary inquiry at the threshold is effectively to emasculate the right of cross-examination itself." 390 U.S. at 131 (footnote omitted), 88 S.Ct. at 750.

We recognize that in some instances the trial court could legitimately permit the witness not to disclose his residence. If the answer may subject the witness to harassment, humiliation, or danger, then nondisclosure of the witness' home address may be justifiable. *Alford*, 282 U.S. at 694, 51 S.Ct. 218; Smith v. Illinois, 390 U.S. at 133–134 (Mr. Justice White, concurring); United States v. Marti, 421 F.2d 1263, 1266 (2d Cir. 1970). But here, neither the Government nor the witness indicated any reason for a desire to prevent the open-court disclosure of Durden's address.[13]

The trial court compounded its error by then restricting counsel's questions directed at Durden's motive for testifying and his possible bias or prejudice. *See* note 12, *supra*. The law has long recognized "the force of a hostile emotion, as influencing the probability of truth telling . . . ; and a partiality of mind is therefore always relevant as discrediting the witness and affecting the weight of his testimony." 3A Wigmore, Evidence § 940 at 775

(Chadbourn rev. 1970). It is essential, when the witness' credibility is critical to the Government's case, that defense counsel "be given a maximum opportunity to test that credibility by exploring the witness' motivation for testifying." United States v. Rodriguez, 439 F.2d 782, 783 (9th Cir. 1971); *see* United States v. Kartman, 417 F.2d at 897. In our view defense counsel in this case were unduly restricted in their attempts to expose any possible prejudice or bias on the part of Durden.

The Government argues that any restrictions placed upon the appellants' right to cross-examine Durden was harmless error. Brookhart v. Janis, 384 U.S. 1, 3, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966) declares, however, that the denial of the right to effective cross-examination is constitutional error and that the appellants need not demonstrate that they were prejudiced thereby. *See* Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347. Moreover, we do not rest our ultimate conclusion on this ground alone. We must look also at the appellants' contention that they were denied a fair trial because of the trial court's active participation therein. A thorough review of the record convinces us that the trial judge overstepped the bounds of judicial propriety by excessively interjecting himself into the proceedings below.

Aside from the limitations that the court placed on defense counsel during

---

13. In United States v. Teller, 412 F.2d 374 (7th Cir. 1969), cited in the dissent, the trial court sustained the Government's objection to a question seeking the informant's address at the time of trial. The informant was permitted to testify, however, that he was presently residing in a motel at government expense. He also disclosed his previous address, which was his residence at the time the offense was committed. Additionally, the informant testified as to his prior convictions and his use of narcotics. He also explained that he expected to help himself by testifying in the Government's behalf. Since the trial court permitted wide cross-examination concerning the informant's past record, and since both the informant's previous residence and his present treatment

by the Government were disclosed, the Seventh Circuit held that the defendant was not denied effective cross-examination.

In *Teller*, the disclosure of the informant's previous residence and the Government's treatment of him opened the "countless avenues of in-court examination and out-of-court investigation." Smith v. Illinois, 390 U.S. at 131, 88 S.Ct. at 750. Conversely, in the present appeal, these same opportunities of investigation and examination were not available to defendants, and no explanation was given for this foreclosure. In the context of the trial court's other restrictions on cross-examination and of its excessive participation in the trial, we think that the nondisclosure of Durden's address was of significant import.

**10**

the cross-examination, the trial judge often came to the aid of the prosecutor by interrupting defense counsel and by participating unduly in the trial. Without detailing each occasion in which the trial court interjected itself into the proceedings, we merely point to the instances when the court over the cross-examination of Billy Harris [14] and of his wife,[15] and of an instance when the court itself attempted to establish the expertise of a government witness.[16] Substantially all of the trial court's interruptions, intentionally or otherwise, aided the prosecution.[17]

■ It is, of course, well settled that:

> "A federal trial judge . . . is more than a moderator or umpire. He has the responsibility to preside in such a way as to promote a fair and ·expeditious development of the facts unencumbered by irrelevancies." Smith v. United States, 305 F.2d

197, 205 (9th Cir.), cert. denied, 371 U.S. 890, 83 S.Ct. 189, 9 L.Ed.2d 124 (1962).

*See* ABA Standards Relating to the Administration of Criminal Justice, The Function of the Trial Judge § 1.1(a) (1972).[18] Indeed, the trial court may properly participate in the examination of witnesses for the purpose of "clarifying the evidence, controlling the orderly presentation of the evidence, confining counsel to evidentiary rulings, and preventing undue repetition of testimony." United States v. Malcolm, 475 F.2d 420, 427 (9th Cir. 1973). But a trial court must be ever mindful of the sensitive role it plays in a jury trial and avoid even the appearance of advocacy or partiality. United States v. Malcolm, 475 F.2d 420 (9th Cir. 1973); *see* ABA Code. of Judicial Conduct Canon 3 (Adopted by the Judicial Conference of the United States, Apr. 1973); *see also* ABA Canons of Judicial Ethics No.

14. During the Government's cross-examination of Billy Harris, the Assistant United States Attorney began to inquire about the terms used in the tape-recorded telephone conversation. The court apparently disapproved of the Government's questions because the court interrupted to ask its own questions concerning the tape-recording. The court proceeded to complete the cross-examination of Harris, this portion of the testimony covering four pages of the transcript. [R.T. 323, 323a, 324, 325.]

15. Billy Harris' wife testified and explained the operation of the wig business that she and her husband owned. After the Government completed its cross-examination, the court again began its own extensive questioning concerning the terms used in . the recorded conversation. [R.T. 333–38.]

16. The Government introduced the testimony of an agent of the BNDD relating to certain materials found in the Inglewood residence. The agent testified that the materials were lactose and milk sugar and that these products were commonly used in the "cutting" of certain narcotics. When one of the defense ·attorneys objected to the agent's testifying as to a matter requiring expertise, the trial court immediately interjected itself into the questioning to establish the agent's expertise for this purpose. [R.T. 251–52.]

17. Although the defendants did not object to each question or interruption of the trial

court, at the close of the defendants' case, counsel for Billy Harris moved for a mistrial:

"Your Honor, I totally respectfully move the court for a mistrial on the grounds the court has invaded the province of the prosecution by taking . over the Government's case, thereby hopelessly prejudicing the jury against the defendants.

"I understand that your Honor is allowed to interject himself in the case; however, I [feel] you have gone beyond the record." [R.T. 344.]

18. Section 1.1(a) of the ABA Standards, The Function of the Trial Judge (1972) provides:

"The trial judge has the responsibility for safeguarding both the rights of the accused and the interests of the public in the administration of criminal justice. The adversary nature of the proceedings does not relieve the trial judge of the obligation of raising on his own initiative, at all appropriate times and in an appropriate manner, matters which may significantly promote a just determination of the trial. The only purpose of a criminal trial is to determine whether the prosecution has established the guilt of the accused as required by law, and the trial judge should not allow the proceedings to be used for any other purpose."

15.[19]   When the participation of the trial judge is designed to elicit answers favorable to the Government, "it is far better for the trial judge to err on the side of [a]bstension from intervention." Blumberg v. United States, 222 F.2d 496, 501 (5th Cir. 1955); *accord*, United States v. Green, 429 F.2d 754 (D.C.Cir. 1970).

In conclusion therefore, we hold that the cumulative effect of the trial court's excessive participation in examining witnesses on behalf of the Government, coupled with unnecessarily severe restraints imposed upon defense counsel in their attempted cross-examination of Durden, could have influenced the jury adversely to the appellants. Even more critical, the court's conduct could have also created the erroneous impression that the court itself was not performing its impartial role.  *Cf.* United States v. Foster, 500 F.2d 1241 (9th Cir. 1974).

Reversed and remanded.[20]

---

19.  Canon 15 of the Canons of Judicial Ethics provides the following:

"A judge may properly intervene in a trial of a case to promote expedition, and prevent unnecessary waste of time, or to clear up some obscurity, but he should bear in mind that his undue interference, impatience, or participation in the examining of witnesses, or a severe attitude on his part toward witnesses, especially those who are excited or terrified by the unusual circumstances of a trial, may tend to prevent the proper presentation of the cause, or the ascertainment of the truth in respect thereto.

"Conversation between the judge and counsel in court is often necessary, but the judge should be studious to avoid controversies which are apt to obscure the merits of the dispute between litigants and lead to its unjust disposition.  In addressing counsel, litigants, or witnesses, he should avoid a controversial manner or tone.

"He should avoid interruptions of counsel in their arguments except to clarify his mind as to their positions, and he should not be tempted to the unnecessary display of learning or a premature judgment."

20.  Contrary to the conclusion expressed in the dissenting opinion, a thorough review of the entire record leaves us with no doubt that the appellants were denied a fair trial. The whole impact of the court's behavior cannot, of course, truly and accurately be reflected without reproducing the entire transcript so that the court's actions can be viewed in their proper context.  Throughout the trial the court interrupted defense counsel, prevented defense counsel from pursuing evidentiary arguments, and abruptly ordered defense counsel to continue the interrogation of witnesses without explaining its various evidentiary rulings.  The court's unusual manner created an atmosphere in which an objectively fair trial could not be conducted. A few examples of the court's comments and actions follow.

During the cross-examination of the informant, Durden, the court often interrupted defense counsel's questioning.

"[MR. WYATT:]   Have you ever used the name John Willard Durden?

A. No I haven't.

Q. Isn't it a fact that on September 18, 1969—

THE COURT:  Come on, counsel, let's get to something relevant to this case.

MR. WYATT: Your Honor, I think this is relevant.

THE COURT:  It is not relevant, Mr. Wyatt[.]   [W]hat happened in 1969 is not relevant to what was happening in 1973.

.    .    .    .    .

Q. Do you recall saying to Mr. Harris, 'Okay.  All right, now, how often—'

THE COURT:  Counsel, you are reading the transcript.  You ought to play the tape now.

MR. WYATT: No, your Honor.

THE COURT:  Then let's get to what is really evidence.

MR. WYATT: Thank you.

.    .    .    .    .

[MR. VODNOY:]  Why was it that you were going to testify for the Government?

THE COURT:  Counsel, let's get to something relevant.

MR. VODNOY: It goes to bias and prejudice of the witness.

THE COURT:  It does not.  Get to something relevant.

.    .    .    .    .

Q. Mr. Durden, when was the next time you either testified or stood ready to testify against somebody on behalf of the Government?

A. Maybe '70 or '71.  I don't remember.

Q. 1970 or '71?

A. Yes.

Q. Did you testify or were you ready to testify?

A. No, I did not.

Q. You did not testify?

A. No.

Q. What was that case in reference to? What kind of case was it?

THE COURT: Get to something relevant. That has nothing to do with this lawsuit.

MR. VODNOY: Your Honor, I will.

THE COURT: Counsel, put a question.

MR. VODNOY: May I state for the record—

THE COURT: Put a question.

[MR. VODNOY:] You have testified on direct that you have testified in previous cases; is that correct?

THE COURT: One case, counsel.

MR. VODNOY: That is on cross[,] not on direct.

THE COURT: All right.

. . . . .

A. I handed her the money. She handed me the contraceptive with the package. Then she counted the money.

Q. That is not what you testified.

THE COURT: Just a moment, Mr. Vodnoy.

MR. VODNOY: I would—

THE COURT: No, statements by counsel as to what was testified to or what was not isn't admis[s]ible. That is for the jury to determine.

[MR. VODNOY:] Isn't it a fact, Mr. Durden, that on direct you testified as follows—

THE COURT: We are not here to test his memory of what he testified on direct, that is for the jury to determine, counsel. Put a question.

. . . . .

Q. Tell the jury about this meeting in the wig shop. What was said by you and what was said by Mr. Harris?

A. There was no meeting in the wig shop.

Q: The meeting you had on Monday or Tuesday that set up the $40,000 sale?

A. I said he told me to come out to the shop. It was not in the shop, it was across the street—it was south of the next street on the west side of the corner from the shop.

Q. Where was that? Was that a coffee shop or something?

A. No, it is not.

Q. What is it?

A. It is a book.

Q. It is a what?

A. A book.

Q. A book?

A. A bookie operation.

Q. A bookie operation? Whose bookie operation?

A. Harris'.

THE COURT: Counsel, let's get to something relevant.

MR. VODNOY: What could be more relevant?

THE COURT: Counsel, do not argue with me. Put a question."

[R.T. 156, 159, 177, 178–79, 189–90, 210–11.]

Later in the trial, after the jury was excused from the courtroom, a dispute arose as to whether the defendants had stipulated that the seized material was heroin. Apparently Billy Harris' present counsel had not agreed to the stipulation, nor had either of the defendants. The trial judge refused to allow defense counsel to discuss the merits of the validity of the stipulation.

"MR. VODNOY: Your Honor, at the bench just previously Mr. Cameron represented that both previous counsel, Mr. Isaacman and Mr. Wyatt, had signed the stipulation and therefore the matter was going to be put over to Monday as far as the chemist.

THE COURT: That is right. When counsel do something I can expect to rely upon what counsel say to the court and to other counsel. If I cannot rely on that we might as well close the doors.

MR. VODNOY: May I finish, your Honor?

THE COURT: No.

Mr. Isaacman is here, I see him in the courtroom.

Mr. Isaacman, did you sign a stipulation with reference to the chemist's testimony in this case?

MR. ISAACMAN: I signed the stipulation, your Honor, with the understanding that my client was going to sign the stipulation also.

MR. WYATT: The same was my situation, your Honor. I signed it with the expectation [that] my client would.

MR. VODNOY: Can Mr. Isaacman be heard more on this?

THE COURT: No, that is all. He made that representation to the United States Attorney and that is sufficient.

MR. VODNOY: Well, I understand—

THE COURT: If we cannot rely upon counsel then we better close the doors.

MR. VODNOY: I want to say my client nor did Mr. Harris, neither two of the defendants agree to that.

MR. WYATT: That is correct, your Honor.

THE COURT: They are not going to be prejudiced by the ruling of the court in any event." [R.T. 266–68.]

Throughout the trial, during the interrogation of other witnesses, the court felt free to interrupt defense counsel. When Birdie Harris' counsel was questioning Billy Harris, the following occurred:

"[MR. VODNOY:] I gather, Mr. Harris
—

THE COURT: No, Mr. Vodnoy. Don't gather anything. Just ask questions." [R.T. 309.]

The court also felt that it had a duty to intervene during the cross-examination of the government chemist. The interrogation concerned the chemist's qualifications and the method by which the chemist determined the chemical composition of the entire 352 grams of seized material by analyzing only 1.7 grams.

"Q. What is the statistical method [used] to test the representativeness of heroin samples?

A. You take some from each part and then mix them up together and run it on the composite.

Q. No. What I mean is if you are [taking] out of 352 grams just 1.7 grams how do I know that the other 350 grams has the same thing as the 1.7 grams?

Q. Is there some scientific principle upon which you form that conclusion?

A. . . . That is a scientific assumption.

Q. What scientific treatise?

A. In other words—

Q. —outlines that assumption?

A. For analytical chemist to do anything he has to get a sample mixed. And then he gets a representative sample.

Q. All right.

A. Then make a composite and then run a test.

Q. I understand that. I understand that. You can't take—

THE COURT: Mr. Vodnoy, he is using the statistical method of common sense. Now get to something relevant.

MR. VODNOY: All right. That is what you say, your Honor. Is that what he is saying?

THE COURT: Just a moment, counsel. Now put a question.

MR. VODNOY: Your Honor, I would object—

THE COURT: Put a question.

[MR. VODNOY:] What [have] your academic qualifications to do with the comparisons you are making? Why can't I make the same comparison just by learning what color something is supposed to turn or what I am supposed to see on the chromatographer [sic] or what I am supposed to see on a crystal?

THE COURT: Mr. Vodnoy, when you know that you are an expert.

MR. VODNOY: I would like to know what his—

THE COURT: Just a moment, counsel. Put a question. That question does not need an answer.

[MR. VODNOY:] Tell me about what relationship your academic credentials or qualifications have with what you do?

MR. CAMERON: Objection, your Honor.

THE COURT: The objection is sustained." [R.T. 367, 369, 370–71.]

Although we have concluded that the trial court acted within its discretion in denying Birdie Harris' motion for a continuance, we cannot condone the manner in which the motion was handled by the court. While Birdie Harris was still being represented by Mr. Isaacman of the Federal Public Defender's office, the following exchange transpired:

"MR. ISAACMAN: Your Honor, Mrs. Harris is not ready for trial and would seek a short continuance. She tells me she has retained private counsel, a gentleman by the name of Walter Gordon and that he will represent her, she tells me.

THE COURT: When did you talk to Mr. Gordon?

DEFENDANT BIRDIE HARRIS: Last night.

THE COURT: That is too late. Start the trial with Mr. Isaacman who has been appointed for you.

MR. ISAACMAN: I should indicate to the court that Mrs. Harris has not given me her version of the case. She has not cooperated with me and does not have confidence in me to represent her. Accordingly I am not prepared to present her defense.

THE COURT: Well, she cannot just do that, just sit back and do that. She has been in this court house several times between the time she was arraigned and this matter came to trial. If she did not want to talk to you then she had plenty of time to advise this court.

The motion to continue is denied." [R.T. 12–14.]

On Thursday, April 19th, after Mr. Vodnoy was substituted as counsel for Birdie Harris, the following colloquy occurred:

"[MR. VODNOY:] I am satisfied that I have been given full discovery from the Government.

I am in the process of looking at the material at this time. It is my belief, your Honor, that I would like to schedule a motion to suppress to reverse the warrant [sic]. I need time to research the law on that matter.

Also, I believe in terms of representing this defendant appropriately if I could have the week end to prepare this case on Monday if it is a one-day jury trial I believe that I can be adequately prepared. I do not think any lawyer could possibly be

**14**

KILKENNY, Circuit Judge (Concurring and dissenting):

The majority found no error as to appellants' first three contentions and I concur in this result. However, as to the last two contentions, I cannot agree with the majority's conclusions and accordingly dissent.

prepared on a case of this magnitude in one day.

THE COURT: Mr. Vodnoy, you probably have tried a hundred cases like this. This is not a complicated factual situation or legal situation, either one." [R.T. 73–74.]

The next morning, defense counsel renewed his motion for a continuance and attempted to state his grounds for such motion.

"[MR. VODNOY:] In this particular instance, your Honor, after the recess at 1:30 your Honor stated that the matter would go over to this morning. I would like to outline what I have done on the case.

THE COURT: You do not have to do that, counsel.

MR. VODNOY: I want to explain why I am not prepared for trial. I am only prepared for the motion to suppress.

THE COURT: No, Mr. Vodnoy. The trial is going to go today.

MR. VODNOY: I would like to make a record, your Honor.

THE COURT: No, Mr. Vodnoy.

MR. VODNOY: *You are not allowing me to make a record?*

THE COURT: *No. The answer is no. This is a very simple case.*

MR. VODNOY: It is a very simple case?

THE COURT: It is a simple case, counsel.

MR. VODNOY: Your Honor, the reason you silenced me yesterday when you said this was a very simple case, and I have tried hundreds of cases, was because I believed you at the time. However, after examining the case I believe it is not a very simple case. It is a very complicated case. I will explain to you in one moment exactly why.

I have only worked on the motion to suppress and I will tell you what the grounds for the motion to suppress are. You will see the complexity of the motion to suppress and you will see why I have not had time to work on the trial of the case.

THE COURT: Let's proceed with the motion to suppress, counsel." [R.T. 80–81.] (Emphasis supplied.)

After the hearing on defendants' motion to suppress was conducted, Mr. Vodnoy renewed his motion:

"MR. VODNOY: Your Honor, before you bring in the jury I would like to state for the record that I am not prepared for trial because I have devoted all my energies from 1:30 last night until 1:30 this morning to prepare for the motion to suppress.

THE COURT: If you prepared the motion to suppress, Mr. Vodnoy,—no, you have to be ready for trial because that is what this is all about.

MR. VODNOY: If I may briefly state that a part of the trial is whether you put a defendant on the stand or not. I have had no opportunity other than one interview with the defendant to ascertain who she was.

THE COURT: You will have time during the Government's case to do that."
[R.T. 107.]

The court often summarily rejected defense counsel's requests before, or without, allowing counsel to present arguments. One such instance occurred when attorney Vodnoy attempted to challenge the veracity of the search warrant affidavit.

"[MR. VODNOY:] I will state parenthetically that I have read the warrant. The warrant is good on its face[.] I will submit, and I will stipulate to that.

THE COURT: Then that takes care of that.

MR. VODNOY: I don't think that takes care of it, your Honor.

THE COURT: You won't go behind the warrant.

MR. VODNOY: *May I make a record on that at least?*

THE COURT: *No.*" [R.T. 82.] (Emphasis supplied.) ·

Even though the court then permitted counsel to cite from other authorities before terminating counsel's argument, it is apparent from the record that the trial judge had pre-determined the merits of the warrant issue.

Although none of the instances cited above, considered alone, would be of great significance, we are convinced that the cumulative effect of the court's attitude, rulings, and conduct was to deprive the defendants of a fair trial. When the court's conduct in respect to the defendants is considered with the restrictions the court imposed on cross-examination, "such misadventures so persistently pervade the trial [and] are of such magnitude that a courtroom climate unfair to the defendant[s] is discernible from the cold record." Smith v. United States, 305 F.2d 197, 205 (9th Cir.), cert. denied, 371 U.S. 890, 83 S.Ct. 189, 9 L.Ed.2d 124 (1962).

## DENIAL OF RIGHT TO CROSS-EXAMINATION

No principle of law is more firmly settled in this circuit than that which recognizes that the scope and extent of cross-examination generally lies within the sound discretion of the trial court. United States v. Coulter, 474 F.2d 1004 (CA9 1973), cert. denied 414 U.S. 833, 94 S.Ct. 172, 38 L.Ed.2d 68 (1973); United States v. Haili, 443 F.2d 1295 (CA9 1971); Viramontes-Medina v. United States, 411 F.2d 981 (CA9 1969); Harris v. United States, 371 F. 2d 365 (CA9 1967). Only where the record firmly shows that the trial court committed an abuse of discretion will a reversal be required. *Harris, supra.*

There is no question that inquiry into motive and bias are permissible avenues of cross-examination. In the instant case, defense counsel was permitted to cross-examine the informant on the financial remuneration he received for testifying as an informant for the Government,[1] the number of times for which he had testified in this capacity before,[2] and whether he had any cases pending at the time of his appearance for the government in the instant case.[3] There is little question that cross-examination on these subjects was directed to

1. * * *
     *     *     *     *

"Q. In connection with your working as an informant are you paid?
A. No.
Q. Do you receive any consideration from the Government?
A. Other than expense, nothing."
     *     *     *     *

"Q. How much did you make for testifying for the Government?
MR. CAMERON: Asked and answered.
THE COURT: Overruled.
THE WITNESS: I am making nothing.
MR. WYATT: I am sorry.
THE COURT: 'I am making nothing.'
BY MR. VODNOY:
Q. Did you say something about expenses?
A. Well, whatever the expense is, that is not a profit.
Q. Tell me what your expenses are in relation to this case.
A. Oh, I don't know. I haven't submitted them to my accountant yet."
[R.T., pp. 162, 163, 175].

2. * * *
     *     *     *     *

"Q. How many times have you testified for the Government?
A. I don't remember.
Q. Tell me approximately.
A. A couple of times.
Q. Well, a couple of times, that means two times.
A. That is right.
Q. This is the third time or the—
A. The second time.
Q. This is the third time?
A. Second.
Q. You have only testified—
A. Once before.
Q. —once before?
A. Yes.
     *     *     *     *
"Q. How many times have you been prepared to testify for the Government before?
A. Several, three or four.
Q. Three or four times.
When was the first time that you were prepared or did testify for the Government?
A. '69.
Q. 1969?
A. Yes."
     *     *     *     *
[R.T., pp. 175, 176, 176a].

3. * * *
     *     *     *     *

"Q. When was the next time you stood ready to testify or testified on behalf of the Government?
A. '70 or '71.
Q. Did you get paid for that?
A. No, I did not.
Q. When is the—
A. Witness fees.
Q. Witness fees?
A. That's right.
Q. How much did you get paid in witness fees?
A. The standard $20 a day.
Q. $20?
A. I guess.
Q. Did you have a case pending at that time?
A. No, I did not.
Q. You do have a case pending at this time?
A. No, I do not."
     *     *     *     *
[R.T., p. 179].

the elicitation of the informant's motive and possible bias for testifying. Absent a complete denial of this form of inquiry, reversal is not appropriate. *Harris, supra,* at 367.

On cross-examination of the informant, defense counsel attempted to elicit the informant's place of residence. The trial court sustained an objection to this inquiry, and the majority holds this to be error.

In Alford v. United States, 282 U.S. 687 (1931), as reaffirmed in Smith v. Illinois, 390 U.S. 129, 88 S.Ct. 748 (1968), the Supreme Court held that an inquiry into the residence of a witness is a proper subject of cross-examination, indeed, a fundamental component of cross-examination. As with all general rules of law, however, there are exceptions. One exception recognizes that where such disclosure would "tend merely to harass, annoy, or humiliate a witness", then such inquiry goes beyond the proper scope of cross-examination. *Smith, supra,* at 133–134, 88 S.Ct. at 751 (White, J. concurring). Here, the questions might well have been directed to the harassment or annoyance of the informer. The exhaustiveness of the cross-examination on all other subjects branded the witness as an informer of considerable experience. The disclosure of his address might lead only to harassment and annoyance by the criminal element.

It is critical to note that neither *Smith* nor *Alford per se* requires a reversal merely because the district court sustained an objection to a question directed at the elicitation of an informant's address. United States v. Teller, 412 F.2d 374 (CA7 1969), cert. denied 402 U.S. 949, 91 S.Ct. 1603, 29 L.Ed.2d 118 (1971). There, the court held:

"*Smith* requires reversal only where the lack of a witness's name and address denies a defendant an opportunity to effectively cross-examine a witness. When this happens, a defendant is denied his Sixth Amendment right to confrontation. *However, the initial question is whether the defendant was denied effective cross-examination.*" [Emphasis supplied]. 412 F.2d at 380.

*Teller* represents the sound approach. The mere denial of a disclosure of a witness's address will not constitute a violation of the defendant's Sixth Amendment right to confrontation absent a showing that without such disclosure, the defendant was denied effective cross-examination. The record before us conveys a picture of a thorough cross-examination of the informant— the cross-examination covering more than seventy-five pages of the transcript. It clearly shows that cross-examination was in no way inhibited by the court's disallowance of defense counsel's attempt to reveal the informant's address. Since there is absolutely nothing in the extended cross-examination which would in any way indicate that the address of the witness might have produced evidence of value to the appellant, the majority's desperate attempt to reconcile *Teller* completely misses the mark. Here, I repeat, the record is devoid of any showing on the part of appellant, or otherwise, that the absence of the witness's address effectively interfered with the cross-examination.

## TRIAL COURT'S EXAMINATION OF WITNESSES

The majority assigns as error the trial court's active participation in questioning several witnesses. In each instance, it concludes that this participation was an aid, whether intentional or otherwise, to the prosecution. I cannot agree.

It is axiomatic that "[i]n a trial by jury in a federal court, the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law." Quercia v. United States, 289 U.S. 466, 469, 53 S.Ct. 698, 698, 77 L.Ed. 1321 (1933). Needless to say, the trial court may participate in the examination of witnesses with a goal toward clarification of the evidence. United

States v. Malcolm, 475 F.2d 420, 427 (CA9 1973).

The majority zeros in on what it considers to be numerous examples of erroneous trial court participation. One such instance involves the testimony of appellant, Billy Harris. The prosecution was cross-examining Harris in an attempt to clarify portions of a conversation [contained in a tape recording] to which Harris was a party. During cross-examination, the trial court intervened. This intervention was surely proper, for the trial court only commenced the examination after the appellant admitted that he was confused by counsel's questions. The trial court's questioning evinces nothing more than an attempt to elicit facts and clarify obscure testimony. Additionally, at the close of the trial court's examination, it specifically asked counsel for both sides whether they desired to question the witness further.[4] The fact that defense counsel, at the close of the evidence, moved for a mistrial does not nullify his rejection of the court's offer to permit further examination. Beyond that, counsel cannot wait until the end of the trial and then challenge the conduct of the judge in an area where the judge has an admitted right of intervention. In my opinion, appellants have failed to show how this examination prejudiced them. The majority's other examples of purported impermissible participation by the trial court are no more convincing.

Further, at no time after the trial court's examination of any of the witnesses, did counsel for the defense object to the manner in which the trial court engaged in its examination. As this court stressed in McConney v. United States, 421 F.2d 248 (CA9 1970), cert.

denied 400 U.S. 821, 91 S.Ct. 39, 27 L. Ed.2d 49, where the record shows that defense counsel registered no objection to the court's questions, this is an important indicia in finding no trial court error, especially where the record fails to establish any prejudice to the appellants arising from such examination.

This court, in Marshall v. United States, 409 F.2d 925 (CA9 1969), correctly observed that where an objection is not offered, the alleged error cannot be questioned on appeal unless the very exceptional situation arises whereby review is necessitated to prevent a miscarriage of justice. *See* United States v. Brooks, 473 F.2d 817 (CA9 1973), and Vitello v. United States, 425 F.2d 416 (CA9 1970), cert. denied 400 U.S. 822, 91 S.Ct. 43, 27 L.Ed.2d 50. While the trial judge may have participated more vigorously than most, the record, as a whole, does not portray an effort, whether by design or otherwise, to interfere with or impede counsel in the presentation of their cases. Active participation by the judge, standing alone, is not sufficient to warrant a reversal absent a showing that appellants were deprived of a fair trial by the participation. Smith v. United States, 305 F.2d 197 (CA9 1962), cert. denied 371 U.S. 890, 83 S.Ct. 189, 9 L.Ed.2d 124. It is there said at page 205:

" . . . [D]uring the stress of a criminal trial, few, if any judges can altogether avoid words or action, inadvertent or otherwise, which seem inappropriate when later examined in the calm cloisters of the appellate court."

Be that as it may, in my view, the great majority of the court's rulings were proper and his interventions in the examination were prompted by the inability, or deliberate failure, of counsel to

---

4. \* \* \*

    \*    \*    \*    \*    \*

"THE COURT: Anything further, gentlemen?

MR. CAMERON: Nothing further.

THE COURT: Anything further?

MR. WYATT: Nothing further.

MR. VODNOY: No, your Honor."

    \*    \*    \*    \*    \*

[R.T., pp. 325, 326].

ask proper questions. [See questions and answers under majority footnote 20].

The majority's position is not strengthened by drawing attention to colloquies between the trial judge and counsel, and a discussion between the court and counsel on a motion for a continuance, all of which occurred outside the presence of the jury. The majority's manifest anxiety, in attempting to transform these non-prejudicial occurrences into purported trial court error, is clearly demonstrated by the massive footnotes, over twenty-five percent of which are non-prejudicial discourse. I had always thought that the judge and counsel, when outside the presence of the jury, could, in effect, choose their own weapons. In any event, the majority has failed to enlighten me on how, in these circumstances, the jury's verdict could be affected by the judge's conduct.

One prominent author has compared the trial judge to a "traffic cop"—one who is often required to make an "immediate, forceful, and intimidating response" to varied situations and contingencies.[5] This is perhaps a strained analogy, yet this court, in Robinson v. United States, 401 F.2d 248, 252 (CA9 1968), has recognized the often precarious position of the trial judge:

> "[T]he trial judge has a wide discretion in his management of the trial. Trial judges are human beings who are unique in their temperaments and intellectual qualities. and it is, of course impossible to man the benches with judges each of whom would fit into a common mold."

## CONCLUSION

Finding no error which in any way affected the substantial rights of the appellants, Rule 52(a), F.R.Crim.P., I would affirm the judgments of the lower court.

---

5. Alschuler, Courtroom Misconduct by Prosecutors and Trial Judges, 50 Texas L.Rev. 629, 678 (1972).